**Desmond DAVIS, Plaintiff,**

v.

**LITTON BIONETICS, INC., Defendant.**

**Civ. No. H–75–1015.**

United States District Court,
D. Maryland.

Feb. 15, 1978.

Eileen M. Stein, Silver Spring, Md., for plaintiff.

Monte Fried, Baltimore, Md., and William F. Jordan, Beverly Hills, Cal., for defendant.

ALEXANDER HARVEY, II, District Judge:

Desmond Davis, the plaintiff in this civil action, is a black male who here seeks damages and other relief from his employer under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Litton Bionetics, Inc., the corporate defendant (hereinafter "LBI" or "the defendant"), conducts scientific and medical research, including experiments on animals, at various locations in Maryland and Virginia, much of

its work being done under contract with the federal government. Born in British Guiana, South America, plaintiff came to the United States in 1959 and was first employed by defendant on June 27, 1966 as a porter.[1]

In this suit, plaintiff asserts that on three separate occasions, the defendant discriminated against him because of his race by failing to promote him to positions for which he was qualified. In March of 1972, a vacancy occurred in a position known as "Animal Care Supervisor" in defendant's Department of Pharmacology and Toxicology, and this position was filled by a former employee, one Jackie Farmer, a white male. In July of 1972, a new position known as "Animal Technician, Specialist, or Research Assistant" was created in that same Department. An employee named Ned Leverage, a white male, was transferred into the Department and given that job. In August of 1973, when Leverage transferred to another job, his position was filled by a white employee named Don Thornett. Plaintiff claims that he applied for but was denied promotion to each of these three positions because of his race.[2] As relief, plaintiff seeks an injunction prohibiting further racial discrimination against him and requiring his promotion to the first available managerial position, back pay, attorney's fees and costs.

In opposing plaintiff's claims for relief, defendant asserts that plaintiff was not promoted to the Farmer and Leverage jobs because he was not qualified for them, and that plaintiff did not apply for the Thornett job. Defendant further contends that there were legitimate, non-discriminatory reasons for defendant's refusal to give plaintiff the Farmer and Leverage jobs.

This case came on for trial before the Court sitting without a jury. Various witnesses testified on behalf of the parties and numerous exhibits were entered in evidence. This Court's findings of fact and conclusions of law, under Rule 52(a) of the Federal Rules of Civil Procedure, are embodied in this Opinion, whether or not expressly so characterized.

I

*The applicable legal principles*

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established a three-step procedure for the determination of racial employment discrimination cases brought under Title VII of the Civil Rights Act of 1964. *See Franklin v. Troxel Manufacturing Co.*, 501 F.2d 1013, 1014 (6th Cir. 1974). As the first step, the plaintiff is required to carry the burden of proving a prima facie case. In *McDonnell Douglas Corp.*, Mr. Justice Powell said the following (411 U.S. at page 802, 93 S.Ct. at page 1824):

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

At this point in the Opinion, the following was said by way of a footnote (411 U.S. at 802, n. 13, 93 S.Ct. at 1824):

13. The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [complainant] in this case is not necessarily applicable in every respect to differing factual situations.[3]

---

1. Plaintiff is still employed by the defendant.

2. These three positions will be referred to herein as "the Farmer job," "the Leverage job" and "the Thornett job."

3. *McDonnell Douglas Corp. v. Green, supra,* was concerned with a charge of discrimination by an employer in failing to re-employ the plaintiff. The same test would appear to be applicable in a case such as this one involving

If the plaintiff satisfies this initial requirement, the burden then shifts to the defendant to establish a legitimate, non-discriminatory reason for the action taken.

The burden then must shift to the employer to articulate some legitimate, non-discriminatory reason for the employee's rejection. We need not attempt in the instant case to detail every matter which fairly could be recognized as a reasonable basis for a refusal to hire. Here petitioner has assigned respondent's participation in unlawful conduct against it as the cause for his rejection. We think that this suffices to discharge petitioner's burden of proof at this stage and to meet respondent's prima facie case of discrimination. (411 U.S. at 802–803, 93 S.Ct. at 1824.)

But even if a defendant satisfies its initial burden and meets a plaintiff's prima facie case, that is not the end of the inquiry which a trial court should make, because an otherwise valid reason advanced by the employer may be used as a pretext for the action taken. The third step of the procedure in question was described by Mr. Justice Powell as follows:

Petitioner's reason for rejection thus suffices to meet the prima facie case, but the inquiry must not end here. While Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner to use respondent's conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1). On remand, respondent must, as the Court of Appeals recognized, be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretextual. Especially relevant to such showing would be evidence that white employees involved in acts against petitioner of comparable seriousness to the "stall-in" were nevertheless retained or rehired. Petitioner may justifiably refuse to rehire one who has engaged in unlawful, disruptive acts against it, but only if this crite-

rion is applied alike to members of all races.

Other evidence that may be relevant to any showing of pretextuality includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities; and petitioner's general policy and practice with respect to minority employment. On the latter point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks. (411 U.S. at 804–805, 93 S.Ct. at 1825.)

■ Although accepting *McDonnell Douglas Corp.* as controlling here, defendant contends that recent decisions of the Supreme Court have added a fifth requirement to the first part of the three-step procedure. Relying on a footnote in *McDonnell Douglas Corp.* and another footnote in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), defendant argues that the plaintiff must also establish discriminatory motive in order to make out a prima facie case. This Court would disagree. In footnote 18 of the *McDonnell Douglas Corp.* opinion, 411 U.S. at 805, n. 18, 93 S.Ct. 1817, the Court was referring to the third step of the procedure rather than the first step. In the *International Brotherhood of Teamsters* case, footnote 15 states that "proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." 431 U.S. at 335–336, n. 15, 97 S.Ct. at 1854. The Supreme Court was not by virtue of that comment adding a fifth requirement to the four stated in *McDonnell Douglas Corp.* as necessary for a plaintiff to prove to make out a prima facie case. An inference of discriminatory motive may be derived by the fact-finder if a

alleged discrimination in failing to promote a plaintiff. *Thompson v. McDonnell Douglas Corp.*, 416 F.Supp. 972, 980 (E.D.Mo.1976), aff'd, 552 F.2d 220 (8th Cir. 1977)

plaintiff satisfies his burden as to these four basic requirements.

In this particular case, the Court is dealing with three separate "individualized" decisions made by the defendant as to the filling of certain employment positions. *See* 411 U.S. at 805, n. 19, 93 S.Ct. 1817. In two instances, the defendant contends that plaintiff was not qualified for the job in question and that, in any event, the white male who filled the position was better qualified than plaintiff. In the third instance, the defendant asserts that plaintiff was not interested in filling the position and did not apply for it. A detailed inquiry into the facts is necessary to decide the questions presented.

## II

### *The facts*

Born in British Guiana [4] in 1935, plaintiff, a black male, completed his primary and secondary education in that foreign country and came to the United States in 1959 at the age of 24. He subsequently applied for citizenship and became a naturalized citizen of the United States in 1967. Between 1960 and 1966, plaintiff was employed as a night watchman for a firm in Washington, D. C. and as a garage attendant. Between 1963 and 1965, he attended Howard University, completing two years of study there, but he did not complete requirements for an undergraduate degree.

On June 13, 1966, plaintiff filled out an application for employment with Bionetics Research Laboratories, Inc., the predecessor of the defendant LBI. Plaintiff was hired on June 27, 1966 as a porter and was given a job classification "Animal Aide-027." Most of the work of LBI in Maryland and Virginia involves experimental medical and scientific research using animals. From the outset, plaintiff was dissatisfied with his job as a porter, and he sought a transfer so that he might become more involved with the technical work done with animals at defendant's laboratories. In January 1967, he began performing animal care duties, and in June 1967, he was promoted to the position of "Senior Animal Aide—026," and worked in the Department of Laboratory Animal Medicine in Kensington, Maryland. His performance ratings in these early years were generally good or excellent, but it was noted that he was often argumentative and was inept in some aspects of interpersonal relations. In June of 1968, Dr. E. Ross Hart, the head of the Department, observed that he expected that such ineptness would disappear in time. During these early years, plaintiff regularly received increases in salary. As a Senior Animal Aide, he was considered to be a working supervisor of a team of animal men, and in October 1968, his job title was changed to "Animal Technician—505." During the years 1967 to 1970, plaintiff, recognizing his weakness in matters of animal care and other technical subjects relating to his employment, took several job-related training courses offered through LBI or otherwise.

In April 1971, the project on which plaintiff had been working in defendant's Department of Laboratory Animal Medicine in Kensington, Maryland was phased out. That project involved a malaria study for the United States Army and included the administration of and the observation of the effects of certain drugs given to young monkeys. Plaintiff was then transferred to the Primate Breeding Section, which was a part of the Reproductive Biology Branch of the same Department headed by Dr. David Martin, and which was also located in Kensington, Maryland. This transfer was intended to give plaintiff experience in breeding colony procedures, and plaintiff was assigned the duties of "Acting Leader" in one of the wards.

Plaintiff was not satisfied with the duties assigned to him in this new job and felt that he was not receiving the training which he had been promised. In July 1971, plaintiff was approached by Dr. Hart, un-

---

**4.** That South American country became independent of Great Britain in 1966 and is now known as "Guyana."

der whom he had previously worked, and was asked to come to work in the Department of Pharmacology and Toxicology in defendant's facility at Falls Church, Virginia. Plaintiff agreed and on July 26, 1971, he was promoted to the job of "Principal Animal Technician—506," and was transferred to the Department of Pharmacology and Toxicology. In this new job, plaintiff worked with rodents and other small animals, assisting in various laboratory experiments. In late March 1972, a vacancy occurred for the position known as "Animal Care Supervisor." In general, that individual was charged with the responsibility for all the animals being used in the Department of Pharmacology and Toxicology. LBI's "Requisition for Personnel" form indicated that the duties to be performed by the individual filling that position included responsibility for the care of rats and dogs, the administration of drugs to animals and the bleeding of animals. This position was filled by Jackie Farmer, a white male who had previously worked for the defendant but who had left in 1967 to take a better job with a competitor, Hazleton Laboratories, Inc.

After Farmer was hired, plaintiff complained to LBI's Industrial Relations Department that he had been discriminated against because of his race when he was not considered for this vacancy. An investigation was accordingly undertaken by personnel of the defendant, including its EEO consultant. As a result of its investigation, LBI concluded that plaintiff had not been subjected to discrimination, but it was decided in any event to give him a wage increase with the hope that he would not then pursue his claim of racial discrimination further. However, plaintiff was not satisfied with this disposition of the matter and subsequently filed a complaint with the EEOC.

In July 1972, a new position was created in the Department of Pharmacology and Toxicology, namely that of "Animal Techni-

cian Specialist, or Research Assistant— 309."[5] The Department had been encountering various problems in the operation of several of its projects, including financial problems, and consideration was even being given to discontinuing its work altogether. The responsibilities to be assumed by the individual filling this new position included supervising the laboratory and the technical staff, maintaining records and budget control. The Requisition form indicated that a college degree was desirable but not essential, and that the individual filling the position should have several years experience in conducting laboratory animal investigations. This position was filled by William E. (Ned) Leverage, Jr., a white male who had an undergraduate degree in Animal Science and who had also completed most of his work for his master's degree.

Leverage commenced his duties in the new job in late July 1972. Plaintiff worked under Leverage, and at the outset there was some friction between the two men. Indeed, in the early fall of 1972, plaintiff refused to work on a weekend, and in a memorandum dated September 8, 1972, Leverage reported such refusal to Dr. Hart, the Director, as "completely unacceptable" and "indicative of an uncooperative attitude." However, in the months that followed, plaintiff's performance improved markedly. Leverage even recommended to Dr. Hart in April 1973 that plaintiff be promoted to the job of Assistant Supervisor. Leverage indicated that plaintiff had made an honest and successful attempt to correct the deficiencies mentioned in the memorandum of September 8, 1972, and that as far as he, Leverage, was concerned, the memorandum was no longer applicable to plaintiff's situation. Dr. Hart approved the promotion, agreeing that plaintiff had undergone a considerable change in attitude and had become a far more effective employee than previously. Dr. Hart further congratulated Leverage for recognizing plaintiff's potential and developing him.

5. Plaintiff contends that the title of the position was "Laboratory Supervisor." However, the Requisition form dated July 5, 1972 indicated that the title for the new job would be "Approx. An. Tech., Spec. or Res. Asst. (309)".

In the spring of 1973, Leverage told the plaintiff that he might be leaving at the end of the year and that if he did, plaintiff was the logical successor to take over Leverage's supervisory position. Leverage went so far as to tell plaintiff that he "would be promoted" when Leverage left. Several months later, in July or August of 1973, plaintiff learned from another employee that Leverage was leaving. Plaintiff was shocked because he had understood that Leverage himself would tell him of the decision, which was a matter of considerable concern to plaintiff since he would be filling the position. Plaintiff approached Leverage, and there is a sharp dispute concerning the substance of the conversation between those two individuals which then ensued in late July or early August of 1973. Plaintiff testified that he reminded Leverage of their earlier conversation, expecting Leverage to reaffirm his promise to recommend plaintiff for his job. Instead, according to plaintiff, Leverage said that plaintiff would have to fill out an application and go through normal channels. Plaintiff interpreted Leverage's remarks as indicating that Leverage would not recommend him for the position, and he therefore did not submit a formal application for the position. Leverage, on the other hand, testified that plaintiff told him that he was not interested in the position for a number of different reasons, including his lack of technical competence and his dislike of Dr. Hart. Thereafter, Leverage recommended Don Thornett for the job which was later filled by Thornett, a white employee who was transferred from defendant's Kensington, Maryland facility to fill the position.

## III

### The first step—plaintiff's burden

█ In this suit, plaintiff claims that he was denied each of these three promotions because of his race. When the facts as set forth herein are considered under the standards of *McDonnell Douglas v. Green, supra*, it is apparent that plaintiff has adequately shown that he belongs to a racial minority, that he was not promoted to any one of the three positions in question, and that these positions were later filled by white applicants. In opposing plaintiff's claims for relief, defendant contends that the plaintiff has not satisfied his burden of proving that he was qualified for the Farmer job and the Leverage job. Defendant concedes that plaintiff was qualified for the Thornett job, but argues that plaintiff has not met his burden of proving that he applied for that position.

After considering all the evidence produced and giving due weight to the credibility of the witnesses, this Court concludes that plaintiff has not met his burden of proving that he was qualified to fill the Farmer job in March of 1972 and the Leverage job in July of 1972. Born and raised in the small South American Country of British Guiana, plaintiff's schooling there was not comparable to an education received in the United States. Before he joined the employ of defendant as a porter, plaintiff had not previously had experience in caring for or working with research animals, having theretofore worked as a night watchman and a garage attendant in Washington, D. C. From 1966 until July of 1971, plaintiff had worked at defendant's Kensington, Maryland facility in the Department of Laboratory Animal Medicine. His work in Kensington was almost entirely with monkeys.

Because his original job had been phased out and because he was unhappy working in the breeding colony in Kensington, plaintiff was transferred in August 1971 to defendant's Falls Church, Virginia facility and started working in an entirely different Department, namely the Department of Pharmacology and Toxicology. At the Falls Church facility, employees worked with small animals rather than monkeys, including rats, dogs and rabbits. Thus, in late March 1972 when there was a vacancy for an Animal Care Supervisor, plaintiff had been working in this particular field for only eight months. In particular, plaintiff lacked a specific essential skill for the job in question. That skill consisted of means for innoculating or taking blood from a rat.

Because of the small size of the animal, this could be done only from a vein in the rat's tail. The procedure was a complicated one, and the evidence indicates that plaintiff did not have the necessary skill or experience to perform it. Defendant's "Requisition for Personnel" form spells out the fact that the administration of drugs to rats and dogs and the bleeding of these animals were essential duties to be performed by the person who would fill the job of Animal Care Supervisor.

Moreover, plaintiff in March of 1972 lacked supervisory skills, having experienced continuing problems in his interpersonal relations with other employees. The testimony of Carol W. Brown, a black female, is significant in this regard and will be fully credited by the Court. Ms. Brown was employed by defendant at the Falls Church facility between 1969 and 1973 and worked there with plaintiff after he was transferred in August 1971. She testified that plaintiff, besides lacking experience, did not then have the ability to get along with other people, and she did not believe that plaintiff was qualified for the job of Animal Care Supervisor because of these deficiencies. She further testified that no one at Falls Church, including herself, was qualified for the supervisory position eventually filled by Farmer.

Accordingly, plaintiff was not considered for this position, which instead was offered to Jackie Farmer, a former employee of defendant who had the technical and supervisory skills required. On the record here, this Court finds that plaintiff has not met his burden of proving that he was qualified for the Farmer job.[6] Title VII was designed only to eliminate discrimination and not to require the hiring or promotion of unqualified personnel. *Thompson v. McDonnell Douglas Corp.*, 552 F.2d 220, 222 (8th Cir. 1977).

Some four months after the Farmer job had been filled, a new position was created in the Department of Pharmacology and Toxicology, namely that of Animal Technician, Specialist, or Research Assistant. The evidence in this case discloses that plaintiff was not qualified for that position. Besides undertaking supervisory duties, the individual who would fill this new position was required to have experience in budgeting and finance. Plaintiff possessed no such financial or budgetary experience nor did he possess the technical skills required for the position. Indeed, in August of 1972, he had been a member of this Department for only a year, and he was not a college graduate. The Requisition form for the job indicated that a college graduate was preferred, and the position was eventually filled by Leverage, an individual with an undergraduate college degree.[7] On this record, this court finds that plaintiff has not met the burden imposed on him of proving that he was qualified for the Leverage job.

The facts pertaining to the Thornett job are quite different. By August of 1973, a full year later, plaintiff was thoroughly qualified to step into the shoes of Ned Leverage and undertake his supervisory duties in the Department of Pharmacology and Toxicology. Because he had been educated in and grown up in a small foreign country, plaintiff was not during the early years of his employment with LBI qualified for positions in the United States requiring technical and supervisory skills. However, by August 1973, plaintiff had received sufficient on-the-job training and experience to be fully qualified to take over the Leverage job. Moreover, he had by that time corrected the deficiencies he had earlier shown as to his interpersonal relationships with other employees. Indeed, in April 1973, Leverage had even made the plaintiff his assistant and had promised him that

---

**6.** LBI's policy of promoting qualified employees within the Company was not violated in this instance because plaintiff was not qualified for the position. In any event, Farmer was hardly an "outside" employee. He had previously been employed by defendant for over three

years, had an excellent record while with LBI and was well known to LBI personnel.

**7.** Moreover, Leverage had completed most of the work necessary for his master's degree.

when he (Leverage) left, plaintiff would be promoted to that position. Dr. Hart had congratulated Leverage for training plaintiff and, in spite of plaintiff's earlier deficiencies, developing him to the point where plaintiff was fully qualified to be Leverage's immediate assistant. In view of these facts, defendant has conceded that plaintiff was qualified for promotion to the Thornett job.

In contending that the plaintiff has not established a prima facie case under *McDonnell Douglas Corp. v. Green* insofar as the Thornett job is concerned, defendant asserts that plaintiff did not apply for the position and that plaintiff in fact indicated to Leverage that he was not interested in it. The testimony as to this issue is sharply conflicting. After considering all of the evidence presented, this Court will accept the version of the incident given by the plaintiff. Accordingly, this Court finds that plaintiff had applied for the job when Leverage said that he would be leaving later in the year.

Thoroughly satisfied with plaintiff's performance following the incident that had occurred in September 1972, Leverage had in April 1973 promised the job to the plaintiff. A formal application was hardly necessary under the circumstances. Not only was plaintiff admittedly qualified for the position but, as Leverage's assistant at the time, he was the most logical successor when Leverage left. Company policy required that an assistant fill a position such as this one, if qualified. When in August 1973, Leverage did not tell plaintiff that he had definitely decided to leave and then put plaintiff off by demanding that he file a formal application and be considered along with any other applicants, plaintiff was astounded. Plaintiff quite understandably did not take the useless step of filling out a formal written application for the position in August 1973 when it was quite clear to him that his superior had changed his mind and would not recommend him and that he therefore had little chance of being promoted.

Leverage's testimony that plaintiff was not interested in the promotion is at odds with substantial other evidence in this record. From the moment he joined the employ of the defendant, plaintiff aggressively and consistently sought advancement. Evaluations of his performance by his superiors over the years disclose his attitude in this regard. If anything, plaintiff had too high a regard for his own abilities and sought promotions even when he was not ready for them. It is inconceivable, after he had been employed by defendant for some seven years, after he had consistently sought promotions during that entire period, after he had been promoted to the position of assistant supervisor under Leverage and after he had been promised the job when Leverage left, that he would suddenly decline the promotion for the reasons assigned by Leverage.

Leverage's recollection of his conversation with plaintiff in late July or August of 1973 was not a clear one. He was not sure where he had actually talked to the plaintiff, and he was vague about the details of the conversation. Leverage testified that he often had broad-ranging, philosophical discussions with plaintiff concerning the latter's aspirations and goals. It would appear that Leverage confused what plaintiff may have said to him on these prior occasions with the specific confrontation during the summer of 1973 when Leverage confirmed that he would be leaving. Plaintiff could hardly have been expected to have sought Leverage out to confirm the report he had heard that Leverage was definitely leaving for the sole purpose of then telling Leverage that he was not interested in the job. Plaintiff wanted the job in April 1973 and he still wanted it in August 1973. He sought Leverage out in August to confirm that the position would be his.

Moreover, the testimony of Leverage sharply conflicts with that of Dr. Hart, the Director of the Department. Leverage testified that he told Dr. Hart that he was leaving, that he recommended plaintiff as the logical successor for his supervisory position because plaintiff had been his assistant and that Dr. Hart agreed that plaintiff

should have the job. Dr. Hart recalled no such conversation. According to Dr. Hart, Leverage recommended only Thornett for the job, and Dr. Hart initially had doubts as to the ability of Thornett to fill Leverage's position. Dr. Hart further testified that Leverage finally persuaded him that Thornett was the best man available for the job. Leverage's recommendation of Thornett was accordingly approved.

Based on all the evidence in the case, this Court will not credit Leverage's testimony that plaintiff was not interested in the promotion. On the contrary, full credit will be given to the plaintiff's account of what occurred insofar as the Thornett job was concerned. Moreover, Dr. Hart's testimony that Leverage recommended only Thornett for the position will also be credited. When the evidence is viewed in this light, it is clear that plaintiff has carried his burden of establishing a prima facie case of racial discrimination insofar as the Thornett job is concerned. A black who was fully qualified for and desirous of the promotion and who had been promised the job, plaintiff was not recommended for the position when there was a definite opening. Instead, the job was filled by Thornett, a white employee who was working in another Department in another State. The only reasonable inference to be derived from these facts is that plaintiff was denied the promotion because of his race.

In contending that defendant's failure to promote him to these three jobs was in each instance racially motivated, plaintiff has relied in part on statistical evidence concerning defendant's employment of blacks as supervisors. But the conclusions reached by the Court in this case are not based on the statistical data in the record. The somewhat generalized facts concerning the racial composition of defendant's supervising personnel are entitled to little weight in this case in which the critical issues relate to individualized decisions concerning a particular employee. See McDonnell Douglas

Corp. v. Green, supra, 411 U.S. at 805, n. 19, 93 S.Ct. 1817. Furthermore, the statistical samples relied upon by the plaintiff in this case are too small to be meaningful. See Morita v. Southern California Permanente Medical Group, 541 F.2d 217, 219–220 (9th Cir. 1976); Harper v. TransWorld Airlines, Inc., 525 F.2d 409, 412 (8th Cir. 1975). In finding that plaintiff has made out a prima facie case of racial discrimination as to the Thornett job but not as to the Farmer and Leverage jobs, this Court has relied upon other evidence in the case besides the statistics.

IV

*The second step—defendant's burden*

■ Even were this Court to find that plaintiff had met his initial burden under *McDonnell Douglas Corp.* of establishing a prima facie case of racial discrimination insofar as the Farmer and Leverage jobs are concerned, the record here in any event supports a finding that defendant has proven that there were legitimate non-discriminatory reasons for refusing to promote plaintiff to those positions in March 1972 and in July 1972.[8] Much of the previous discussion likewise applies here. Were this court to assume that plaintiff was qualified for the Farmer and Leverage jobs, the evidence in this case discloses that both Jackie Farmer and Ned Leverage possessed superior qualifications for the positions in question. A finding that another employee is better qualified for the promotion in question is sufficient to defeat a claim of racial discrimination under Title VII. See Olson v. Philco-Ford, 531 F.2d 474 (10th Cir. 1976); Logan v. St. Luke's Hospital Center, 428 F.Supp. 127 (S.D.N.Y.1977).

During the time that he worked for the defendant, Farmer had an excellent performance record. He joined the employ of defendant in July of 1964, and he left in October 1967 to take a higher-paying job

8. Defendant has the burden of establishing such a defense. Whether the "preponderance of the evidence" standard or the "clear and convincing evidence" standard is applied, this Court is satisfied that defendant in this case has met its burden insofar as the Farmer and Leverage jobs are concerned.

with a competing firm. If Farmer's performance reviews for the first few years of his employment with defendant are compared with plaintiff's, it is quite apparent that Farmer had a superior record. From time to time, supervisory personnel rated him as "dependable," "irreplaceable" and "indispensable." Although he, like plaintiff, was not a college graduate, he was termed to be an individual of "unusual ability and value." There is no indication in the record that evaluations of plaintiff were racially motivated during the early years of his employment. On the contrary, plaintiff was consistently rated from "good" to "excellent" by his superiors and he received regular increases in his salary. But Farmer's ratings were even better than those of plaintiff, and the record does not disclose that Farmer (as had plaintiff in the early years) had experienced difficulties in working with other employees. The fact that an employee was unable to work amicably with fellow employees is "a perfectly valid reason" for not considering such employee for a supervisory position. *Nance v. Union Carbide Corp.*, 540 F.2d 718, 727 (4th Cir. 1976).

As the testimony of several witnesses discloses, Farmer, when he took over the job, was the only person in the Department who was able to inoculate rats through the tail vein or draw blood in this manner. This procedure was a tricky one and if not performed property, might result in the death of the laboratory animal. The evidence indicates that plaintiff at the time the job became vacant in March 1972 did not possess this skill. He had spent most of his six years at LBI working with primates at Kensington and had been at the Falls Church facility working with small animals for only some eight months.

Equally apparent from the record here is that Leverage was better qualified than plaintiff for the new supervisory position created in July 1972 in the Department of Pharmacology and Toxicology. Not only was Leverage a college graduate with a degree in Animal Science, but he had also continued his studies in the field and had almost finished the requirements for his master's degree. Plaintiff did not even have a college degree.

Leverage had started working for defendant in 1968, and he was consistently rated as an outstanding employee. Personnel records noted that he was "well thought of" by other employees and that he had "exceptional leadership qualities." Leverage had extensive experience in reproductive biology and had previously acted as a supervisor for laboratory technicians. Moreover, Leverage had prior experience in budgeting and finance and in business management. Because the Falls Church facility had been losing money, responsibility for budgeting and cost control was one of the duties to be undertaken by the new supervisor in July 1972. Leverage was termed a "perfect fit" when the new position was created and so well qualified was he for the position that other employees of defendant were not even considered.

Accordingly, even were it to be assumed that plaintiff was qualified for the Farmer and Leverage jobs, there were legitimate non-discriminatory reasons for defendant's failure to promote plaintiff in March 1972 and July 1972. Farmer and Leverage were both better qualified than plaintiff for the job in question.

But no such reason exists for defendant's refusal to promote plaintiff to the Thornett job. Indeed, defendant has not even contended in this case that Thornett was better qualified than plaintiff to take over Leverage's job. The facts here disclose that plaintiff was the best qualified employee for the job later filled by Thornett. By August 1973, plaintiff had been working under Leverage for over a year and had been made Leverage's immediate assistant in April 1973. Earlier deficiencies had been corrected by that date. Leverage himself was of the opinion that plaintiff could then undertake the responsibilities of the position and had promised the job to plaintiff. Company policy dictated that an assistant should be promoted when an opening such as this one occurred.

Other than plaintiff's race, there is no valid reason why plaintiff was not given the Thornett job. Accordingly, plaintiff is entitled to appropriate relief insofar as the Thornett job is concerned.

## V

### *The third step—pretextuality*

 A review of the record here does not justify any inference that defendant's rejections of plaintiff for the Farmer and Leverage jobs were based on pretensive or pretextual reasons. As discussed hereinabove, both Farmer and Leverage possessed qualifications for the position which were superior to those of the plaintiff. Of course, no issue of pretextuality arises insofar as the Thornett job is concerned, in view of this Court's conclusion that plaintiff is entitled to appropriate relief because of defendant's failure to promote him to the Thornett job on account of his race.

Relying on *Rowe v. General Motors Corporation,* 457 F.2d 348 (5th Cir. 1972), plaintiff argues that evaluations of his qualifications made by his superiors were subjective ones, made by white supervisors who acted with a discriminatory intent. Since these evaluations led to the conclusion that he was not as qualified as Farmer and Leverage for the jobs in question, plaintiff asserts that the reasons advanced for his rejection were pretextual. On the record here, this Court would disagree. Plaintiff generally received good or excellent ratings from his superiors. This is not then a case in which a black plaintiff was not promoted because of poor ratings given by his white supervisors. Plaintiff was not promoted because he did not possess the technical and managerial skills necessary for the jobs in question and because the white males who were promoted had superior qualifications for such jobs. Any negative opinions expressed by plaintiff's white supervisors concerning his ability to work amicably with his fellow employees and to otherwise perform his duties in a satisfactory manner are supported by objective facts in this record.

Accordingly, the evidence here does not indicate that defendant used plaintiff's conduct or performance as a pretext for discriminating against him on account of his race, insofar as the Farmer and Leverage jobs were concerned.

## VI

### *Conclusion*

For the reasons stated, this Court concludes that plaintiff is not entitled to relief because of the failure of defendant to promote him to the Farmer job in March 1972 and to the Leverage job in July 1972. However, plaintiff is entitled to appropriate relief because of the failure of the defendant to promote him to the Thornett job in August 1973. Plaintiff will be entitled to an injunction, back pay, an attorney's fee and costs. Counsel should consult and present to the Court an appropriate Order.