Otis ROBERTSON, Plaintiff,

v.

**MARYLAND STATE DEPARTMENT OF PERSONNEL**

and

**Maryland State Department of Health and Mental Hygiene, Defendants.**

Civ. No. H–76–977.

United States District Court,
D. Maryland.

March 3, 1978.

Norris C. Ramsey and Karon D. Ramsey, Baltimore, Md., for plaintiff.

Charles R. Taylor, Jr., James F. Truitt, Jr. and Jack C. Tranter, Asst. Attys. Gen., Baltimore, Md., for defendants.

## MEMORANDUM DECISION

ALEXANDER HARVEY, II, District Judge:

In this civil action, the plaintiff, a black male, is seeking back pay and other relief

from two separate departments of the State of Maryland. Suit has been brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and also under 42 U.S.C. § 1981. Named as defendants are the Maryland State Department of Personnel and the Maryland State Department of Health and Mental Hygiene.

For a number of years, plaintiff had been employed by the Maryland State Department of Juvenile Services, which is now the Juvenile Services Administration of the State Department of Health and Mental Hygiene. In this suit, plaintiff alleges that because of his race, he was laid off effective June 30, 1973, at which time he was a vice principal at a state institution for juveniles known as the Maryland Training School for Boys. Plaintiff has further alleged that because of his race, he was not rehired at the Maryland Training School for Boys as an assistant superintendent, as a principal or as a teacher after his termination on June 30, 1973, and that after that date, the defendants also failed to rehire him as principal, vice principal, superintendent, assistant superintendent or teacher at various other State institutions, all because of his race. Plaintiff also charges defendants with harassing him and retaliating against him when he asserted his rights. As relief, plaintiff seeks a declaratory judgment, an injunction, back pay, compensatory and punitive damages, attorney's fees and costs.

In opposing plaintiff's claims for relief, defendants assert that the lay-off and the failure of the various State departments to rehire plaintiff were not racially motivated. Defendants further assert that plaintiff was laid off for legitimate, non-discriminatory reasons, and that he did not apply for or was not qualified for the various positions he claims he sought in the State service after his lay-off.

This case came on for trial before the Court sitting without a jury. Various witnesses testified on behalf of both sides, and numerous exhibits were entered in evidence. Much of the evidence was conflicting. In resolving the issues of fact presented, due regard has been had to the credibility of the witnesses and the weight their testimony deserves. This Court's findings of fact and conclusions of law, under Rule 52(a) of the Federal Rules of Civil Procedure, are embodied in this opinion, whether or not expressly so characterized.

## I

### *The applicable legal principles*

#### (a) Title VII

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established a three-step procedure for the determination of racial employment discrimination cases brought under Title VII of the Civil Rights Act of 1964. As the first step, the plaintiff is required to carry the burden of proving a prima facie case. In *McDonnell Douglas Corp.*, Mr. Justice Powell said the following, at page 802, 93 S.Ct. at page 1824:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

At this point in the opinion, the following was said by way of a footnote, 411 U.S. 802, fn. 13, 93 S.Ct. 1824, fn. 13:

> 13. The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent [in this case] is not necessarily applicable in every respect to differing factual situations.

If the plaintiff satisfies this initial requirement, the burden then shifts to the defendant to establish a legitimate, non-discriminatory reason for the action taken.

The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. We need not attempt in the instant case to detail every matter which fairly could be recognized as a reasonable basis for a refusal to hire. Here petitioner has assigned respondent's participation in unlawful conduct against it as the cause for his rejection. We think that this suffices to discharge petitioner's burden of proof at this stage and to meet respondent's prima facie case of discrimination.

411 U.S. at 802–803, 93 S.Ct. at 1824.

But even if the defendant satisfies its initial burden and meets the plaintiff's prima facie case, that is not the end of the inquiry which a trial court should make, because an otherwise valid reason advanced by the employer may be used as a pretext for the action taken. The third step of the procedure in question was described by Mr. Justice Powell, as follows:

Petitioner's reason for rejection thus suffices to meet the prima facie case, but the inquiry must not end here. While Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner to use respondent's conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1). On remand, respondent must, as the Court of Appeals recognized, be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext.

And a little further along:

Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities; and petitioner's general policy and practice with respect to minority employment. On the latter point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a gen-

eral pattern of discrimination against blacks.

411 U.S. at 804–805, 93 S.Ct. at 1825.

In footnote 19, at page 805, 93 S.Ct. 1817, Mr. Justice Powell further observed that the trial court may consider any racial composition of a defendant's labor force as itself reflective of restrictive or exclusionary practices, but cautioned that such general determinations, while helpful, may not be in and of themselves controlling as to "an individualized hiring decision," particularly in the presence of otherwise justifiable reason for rejection of the employee.

■ In this particular case, it should further be noted that Title VII did not apply to states and to departments of states until 1972. The effective date of the amendments of that year was March 24, 1972, and it is clear that the expanded provisions of the Act do not apply retroactively to allegations of discrimination occurring before that effective date. *See Kramer v. Board of Education,* 419 F.Supp. 958, 959 (S.D.N.Y.1976).

### (b) Section 1981

■ Section 1981 protects all persons, white and non-white, from racially motivated deprivations of certain enumerated rights, whether committed under color of state law or by private individuals. Included among those rights is the right to be free from racial discrimination in employment. *See, e. g., Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Sethy v. Alameda County Water Dist.,* 545 F.2d 1157, 1161 n. 7 (9th Cir. 1976) (*en banc*). Unlike § 1983, there is no state action requirement in suits brought under § 1981, and municipalities are not immune from suit. *Sethy v. Alameda County Water Dist., supra; Raffety v. Prince George's County,* 423 F.Supp. 1045, 1061 (D.Md.1976).

■ The rights protected under 1981 are more limited than those protected by § 1983, and only those denials of the protected rights that are denied on the basis of race are actionable. *Georgia v. Rachel,* 384

U.S. 780, 791, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966). However, § 1981 and § 1983 are similar in that both require proof of discriminatory motive and intent. *Lewis v. Bethlehem Steel Corp.,* 440 F.Supp. 949, 965 (D.Md.1977). *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). In other words, to state a claim under § 1981, a plaintiff must prove a deprivation of one of the enumerated rights which, under similar circumstances, would have been accorded to a person of a different race and also that such deprivation was intentional and motivated by racial prejudice.

Insofar as both plaintiff's § 1981 claims and his Title VII claims are concerned, the Court in this case is dealing with a number of separate, individualized decisions made by the defendants, first as to plaintiff's lay-off on June 30, 1973, and subsequently as to the filling of positions which plaintiff claims he was seeking. A detailed inquiry into the facts is necessary to decide the questions presented.

## II

### The facts

Now 57 years of age, plaintiff is a teacher and has been employed in various teaching capacities by the State of Maryland, including positions as a principal and vice principal, until he was laid off on June 30, 1973. Between September 4, 1957 and June 30, 1973, plaintiff was employed by the State of Maryland at the Maryland Training School for Boys (hereinafter "MTS"). MTS is a state institution for the detention of or commitment of delinquent boys.

Between September 1957 and June 30, 1961, plaintiff was employed there in a capacity known as "Teacher II"; for the next four years as an elementary school principal; and between July 1, 1964 and June 30, 1973 as a vice principal. The change from principal to vice principal in 1964 was not a demotion, but was the result of a title change. Plaintiff has been certified by the State Department of Education as a primary and secondary school principal, as a high school teacher and as an elementary education teacher.

In the years 1972 and 1973, various changes were made in the MTS, which were the result of a number of different decisions made by Maryland officials in those years concerning institutions for juveniles run by the State. In 1972, the decision was made to close the Junior School at MTS and in connection with this closing, to eliminate one of the two vice principal positions at the institution. The plaintiff was then vice principal of the Junior School, and Hugh Thomas, also a black male, was vice principal of the Senior School. Plaintiff had more seniority than Thomas. By error, a certification specialist of the Baltimore County Board of Education advised Mr. Robert Harrington, the Superintendent at MTS, that plaintiff was not qualified for the Senior School position. Accordingly, plaintiff was notified that he was being demoted on July 1, 1973 and that Thomas was to be retained. Plaintiff filed a grievance. Following an investigation by representatives of the Maryland State Department of Personnel, plaintiff's claim was upheld, the conclusion having been reached that plaintiff did in fact hold the necessary certification for a vice principal position in the Senior School. Accordingly, plaintiff was not demoted but was retained as a vice principal, along with Thomas.

The positions of teacher, vice principal and principal at MTS and similar institutions under the jurisdiction of the Juvenile Services Administration are unclassified positions, and thus not covered by State Merit System law. However, the positions of superintendent and assistant superintendent are classified. A person who desires employment in a State classified position must file an application, pass the applicable exam and be placed on the appropriate eligible list. Only then may an individual be considered for employment in such a classified position. Moreover, persons whose names appear within the top five on State eligible lists for classified positions must be notified of vacancies as they occur. However, there is no such requirement for unclassified positions, which are not posted or advertised.

In the spring of 1973, further decisions were made by State officials as to the operation of MTS. It was then decided to also close the Senior School, because the principal emphasis of the institution was being changed to one for the housing of detained juveniles rather than the housing of committed juveniles. Detainees were youngsters who were temporarily in custody for no more than thirty days. As to them, it was not possible to have educational programs because their short length of stay would not permit it. The record discloses that the number of commitments at MTS fell from 872 in Fiscal Year 1971 to 336 in Fiscal Year 1973, while the number of detentions for those same years rose from 655 to 1019.

Accordingly, the decision was made by responsible officials of the State Department of Health and Mental Hygiene to eliminate a number of teaching positions at MTS and also both vice principals. Pursuant to that decision, fundings for the vice principal positions were cut out of the state budget for the Fiscal Year beginning July 1, 1973. Plaintiff's job was thus eliminated. Plaintiff's position was one of nine eliminated at MTS at the time, there being seven teachers and two vice principals who were laid off.

In this case, plaintiff focuses on his own lay-off, claiming that it was racially motivated. Having been notified of the impending lay-off, plaintiff at various times in June and July 1973 sought some sort of re-employment with one of the institutions under the jurisdiction of the State Department of Health and Mental Hygiene. He interviewed at several institutions for positions as a principal but was not accepted at any of them. He attributes the State's failure to rehire him as a principal to racial discrimination against him. In his complaint, he has also alleged that because of his race, he was denied positions as a superintendent or vice superintendent at various State institutions. Finally, he claims that he was discriminatorily denied positions as a teacher at these institutions.

The evidence is sharply conflicting as to whether plaintiff was in fact interested in a position as a teacher after his lay-off. Plaintiff concedes, and so testified, that he rejected the offer of a job as a teacher at Great Oaks Center, one of defendants' institutions, but he claimed that he would have taken a teaching position at MTS or at one of defendants' other institutions. Testimony produced by the defendants flatly contradicts this assertion. Not having secured a job through defendants, plaintiff finally went to work for Baltimore County in late July of 1973. Subsequently, he was employed by the Baltimore City School System, where he has worked ever since.

On March 11, 1974, plaintiff filed a charge with the Equal Employment Opportunity Commission. Following receipt of a right-to-sue letter, this civil action was commenced on June 30, 1976.

### III
### *Plaintiff's lay-off*

After due consideration of all the evidence, this Court concludes that defendants did not discriminate against plaintiff because of his race when his position as vice principal at MTS was abolished effective June 30, 1973. There were legitimate policy reasons why both vice principal's jobs were eliminated on that date, and there is no indication that plaintiff was singled out for special treatment because he was black.

After much debate and consideration of a wide range of complex factors, the State officials who were charged with the responsibility for the State's juvenile institutions decided to drastically alter the nature of MTS and of several other institutions under the jurisdiction of the Juvenile Services Administration. No longer would there be so many committed youngsters at MTS who would be in residence long enough to avail themselves of educational programs previously afforded. Rather, the bulk of the population would consist of short-time detainees, who were not there long enough to go through the educational programs. Thus, teaching and various related positions had to be abolished, including plaintiff's position as vice principal.

It should be pointed out that plaintiff was not alone in suffering loss of employment because of this policy decision. Besides the two vice principals, some seven other teachers were laid off at the same time, for a total of nine altogether. Plaintiff draws an adverse inference from the fact that five black academic teachers and only two white academic teachers were laid off at this time. But what plaintiff overlooks is the fact that five black, two Indian and no white academic teachers were retained at MTS. These statistics hardly support any inference of a discriminatory layoff. One hundred percent or all of the white academic teachers were laid off, but only fifty percent of the black teachers lost their jobs.

Plaintiff also relies heavily on the fact that there was an attempt to demote him as a vice principal in 1972 when he had seniority over Hugh Thomas. Certainly, there was no racial significance to this occurrence. Indeed, in his testimony, plaintiff conceded that the decision to demote him in 1972 had nothing to do with race. An honest mistake was made which was corrected when plaintiff pressed his grievance. Had the correct decision been made, Mr. Thomas, another black, would have been the individual demoted to teacher in 1972.

Plaintiff also contends that his position as vice principal at MTS was eliminated by the defendants in order to create the position of Assistant Superintendent at MTS, which was later filled by Sherman Brett, a white male, who came from another institution. The evidence supports no such contention, as there was clearly no connection between plaintiff's lay-off as of June 30, 1973 and Mr. Brett's appointment as Assistant Superintendent some five months later in November 1973.

Along with the other decisions made by officials of the State Department of Health and Mental Hygiene during 1973, the decision was made to close the Victor Cullen School, a State institution in Frederick County. But this decision was not reached until after the lay-offs at MTS were decided upon. As was the case at MTS, the decision at Victor Cullen also required that State employees be laid off. As they did insofar as employees at MTS were concerned, representatives of the defendants sought to assist in finding other jobs in the State service for the employees laid off at Victor Cullen.

Mr. Brett, who had been a principal at Victor Cullen, was transferred to MTS around October 15, 1973, although still carried on the Victor Cullen budget. A month or so later, he became Assistant Superintendent at MTS. This was an entirely different job from that of principal or vice principal, and in fact, was a demotion for Mr. Brett.

Unlike Mr. Brett, plaintiff was neither eligible for nor qualified for the position of Assistant Superintendent. Plaintiff was not on the certified list (as was Mr. Brett) and could not have, under Maryland law, been appointed to this classified position in November 1973.

Plaintiff charges that the Superintendent at MTS, Mr. Robert Harrington, and also the Assistant Director of the Juvenile Services Administration, Mr. Ronald Blake, were racially biased against him. Both of these men were white. But the decision to lay off plaintiff and eight others at MTS was not made by either Mr. Harrington or Mr. Blake. The final decision was made by Mr. Robert C. Hilson, a black, who was Director of the Juvenile Services Administration of the State Department of Health and Mental Hygiene.

Mr. Harrington, in preparing to budget for the Fiscal Year commencing July 1, 1973, had included both vice principal jobs in the budget. However, these budget items were later eliminated by other State officials.

Mr. Blake had little contact with plaintiff, and the record does not show racial bias on his part. I accept Mr. Blake's denial that he ever made the racial remark which another witness attributes to him on one occasion. Mr. Blake was a highly credible witness and was forthright and candid throughout his testimony. I reject the ver-

sion of the incident given by the witness, Mr. Fike, who did not impress the Court as an entirely credible witness. Mr. Fike, a white male, was not particularly happy during the time he was an Assistant Superintendent at MTS, and particularly clashed with Mr. James Dean, who succeeded Mr. Harrington as Superintendent.

Plaintiff also testified that he believed that Mr. Robert Hilson, Director of the Department, was racially biased against him. Such a charge can only be described as fanciful. A black man, Mr. Hilson has held many highly responsible positions in the State government and was an impressive witness. I will give full credit to his testimony to the effect that the decision to eliminate plaintiff's job as a vice principal at MTS was an objective one, made for policy reasons that had nothing to do with race.

With reference to plaintiff's first claim concerning the lay-off, this Court finds first, that plaintiff has not proven that he was laid off as a vice principal at MTS effective June 30, 1973 because of his race, and secondly, that the defendants have proven that there were legitimate, non-discriminatory reasons for the lay-off. Moreover, plaintiff has not sustained his charges of harassment or retaliatory action by the defendants during the time that he was employed as a vice principal at MTS.

The credible evidence here likewise shows that the reasons advanced by defendants for plaintiff's lay-off were not pretextual. The decisions made were objective ones, made by responsible State officials without regard to considerations of plaintiff's race.

## IV

### The failure to rehire claims

▮ The second part of plaintiff's case involves his claim that for racial reasons, the defendants failed to rehire him in any one of a number of different positions within the Juvenile Services Administration or within the entire Department of Health and Mental Hygiene itself.

When viewed in its totality, this claim is a very broad and all-encompassing one. Plaintiff claims that he was not rehired as a superintendent, as an assistant superintendent, as a principal, as a vice principal or as a teacher by the defendants. The difficulty with such a claim is that entirely different considerations obtain as to the various positions which plaintiff claims he sought, and a number of different State officials made the ultimate decisions which are challenged here.

To sustain such a broad charge, plaintiff would have to produce evidence of a wide-ranging conspiracy on the part of numerous State officials, some black and some white, to deny him re-employment because of his race. But no such evidence has been produced, and indeed, plaintiff has admitted that a number of the State officials charged with the responsibility of assisting him to find a job or with actually hiring him were not racially biased.

With no evidence in the record of a broad ranging conspiracy, it is necessary to look at the particular positions themselves. Clearly, plaintiff was not eligible for or qualified for the position of superintendent or assistant superintendent at any of the institutions involved. This Court so ruled at the close of the plaintiff's case. These were classified positions; plaintiff had not applied for and taken the necessary examination and was not on the eligible list. State law did not permit him to be appointed to these positions until he had taken these steps. Accordingly, plaintiff here cannot claim racial discrimination because of the failure of defendants to rehire him as a superintendent or assistant superintendent.

The positions of principal and vice principal involve a somewhat different inquiry. With two exceptions, plaintiff did apply for and was eligible for positions as a principal. Those two exceptions were the position of principal at MTS, an opening which occurred in September 1974, and a similar position at Boys Forestry Camp, which occurred in July 1974, both of these openings then being over a year after most of the events described in the testimony in this

case. Plaintiff did not apply for the MTS position which was filled by Mr. Earl S. Mello, a black male, nor did he apply for the Boys Forestry position, filled by C. N. Bullard, a white male.

Plaintiff argues that he received no notice of these unclassified positions. But State law does not require posting or other notice to persons who might be interested in the positions. Moreover, there is no evidence that State officials at this late date, over a year after plaintiff had been laid off, purposely and for racial reasons failed to give plaintiff notice of the openings. Plaintiff did actively seek principal positions at other institutions, and in fact, interviewed at several of them. Although plaintiff was first on the eligible list, he was not hired by any of these institutions. But any inference of racial discrimination is rebutted by the actual facts.

At Springfield State Hospital, Mr. Barton McNair, a black male, was hired as principal on October 23, 1974. He had been Assistant Principal at this institution for some years and was better qualified for this position in this mental hospital than was plaintiff. In June of 1973, Mr. Casimir Lapinsky, a white male, was hired as principal at the Regional Institute for Children and Adolescents. He also had been with this institution for a number of years and was better qualified than plaintiff to teach emotionally disturbed youngsters. In July of 1973, Mrs. Frances Blair, a black female, was hired as a principal at Great Oaks Center. She was selected over both plaintiff and Mr. Hugh Thomas because she was, in the opinion of the Director, Mr. Lockyear, the most professionally qualified for the position.

These were the only openings for principal positions during the applicable period, and as to each of them, defendants have proven that there were legitimate non-discriminatory reasons for the failure of each of these different State officials to hire plaintiff as a principal at their institutions. The reasons given by each of the different witnesses were not pretextual, but were legitimate ones, which fully supported the hiring decisions made. A finding that an-

other employee is better qualified for the promotion or hiring in question is sufficient to defeat a claim of racial discrimination under Title VII. *See Davis v. Litton Bionetics, Inc.,* 444 F.Supp. 638 (D.C.1978); *Olson v. Philco-Ford,* 531 F.2d 474 (10th Cir. 1976); *Logan v. St. Luke's Hospital Center,* 428 F.Supp. 127 (S.D.N.Y.1977).

Nor can plaintiff succeed in his claim as to a position of vice principal during the applicable period. As stipulated by the parties, there were no openings of vice principal positions during the time period in question.

Plaintiff's reliance on statistics is of little aid to him in this case. There were only ten principal positions in institutions under the jurisdiction of the Department of Health and Mental Hygiene. Between 1970 and the filing of the Pretrial Order in July 1977, there were a total of nine openings. Of these, five black principals and four white principals were hired by the Department at various institutions under its control. During that same period, there were only four vice principals who served at any time in the various schools, all four of whom (including plaintiff and Mr. Thomas) were black. After June 30, 1973, two Assistant Superintendents have been hired at MTS, one black and one white.

Nor is there much significance in this particular case in the fact that some of the institutions under the jurisdiction of the Department of Health and Mental Hygiene have a high percentage of white employees, while others have a high percentage of black employees. These conditions were undoubtedly created before Title VII became applicable to State institutions in March 1972. In this case, the Court is concerned with lay-off and hiring decisions made after the spring of 1973 and involving only the plaintiff. It should be noted that Victor Cullen School, which had 90% white employees, has now been closed after plaintiff was laid off.

Plaintiff's claim that representatives of defendants did not rehire him because of his race is further rebutted by evidence of the steps taken by State officials to try to place

him in a new job. In particular, Miss Dorothy Wade, Chief of Personnel, Juvenile Services Administration, was active in seeking to assist plaintiff in finding other employment with the State. What she and others did hardly indicates an intention on the part of State officials to deny plaintiff further employment with the Department of Health and Mental Hygiene because of his race.

With reference to plaintiff's claims that defendants failed to rehire him as a teacher at any one of a number of institutions, this Court finds that plaintiff, at the critical times involved here, was not interested in a position as a teacher, either with the Juvenile Services Administration or with the Department of Health and Mental Hygiene. The finding is that he did not apply for the jobs which he now says he sought. Thus, plaintiff has not satisfied his initial burden under the *McDonnell Douglas* case, insofar as positions as a teacher are concerned.

With reference to teaching positions, plaintiff's present claim is thus no more than an afterthought, pressed long after the actual fact and after he was not able to secure a position as a principal. The evidence in this case on this issue is conflicting. However, this Court will credit the testimony of both Mr. Harrington, a white male, and of Mr. Jolivet, a black male. Plaintiff told Mr. Harrington, the Superintendent at MTS, that he was not interested in a teaching position at MTS. He told Mr. Jolivet, Personnel Services Officer of the Department of Health and Mental Hygiene, that he was interested in being rehired by the State only in a position as a principal, and that he was not interested in a teaching position at any of the institutions under the jurisdiction of the Department. Both of these statements were made after plaintiff knew of his impending lay-off.

Further corroboration for the Court's finding may be found in the fact that in the fall of 1973, plaintiff spoke to Mr. James Dean, who succeeded Mr. Harrington as Superintendent at MTS, and never once mentioned that he was interested in securing a job at MTS as a teacher. Certainly, if he was then actively seeking a teaching job at this time, he would have broached the subject to the Superintendent, Mr. Dean.

What is apparent from all the evidence in this case is that plaintiff was a very proud man, as he had every right to be. Fully certified as a teacher and with a M.A. degree, plaintiff had advanced to positions of both a principal and a vice principal at various times, and it was too much for him, following his lay-off, to go back to merely a teaching job. Thus, he held out for a job as a principal because of the prestige attached to such a position and because he did not want to take a backward step in his career.

This Court finds that had plaintiff actually desired a teaching position during the period involved in this suit, he would have been so hired by the State Department of Health and Mental Hygiene. Indeed, plaintiff was offered a teaching job at Great Oaks Center, but turned it down. He admits this, but claims that he was told that he would earn only $7500 and asserts that he did not want to commute 80 miles a day for such a salary. These justifications will be rejected by this Court. Certainly, plaintiff would have taken a job as *principal* at Great Oaks had one been offered him and would have overlooked the distance factor.

Moreover, this Court will fully credit the testimony of Mr. Joyce, who did not tell plaintiff that his salary would be merely $7500. But what Mr. Joyce said to plaintiff was that the Montgomery County School Board would evaluate plaintiff's teaching experience and would assign him a proper salary retroactively. A simple check by plaintiff would have disclosed that had he been employed as a teacher at Great Oaks, he would have received the handsome salary of $19,700 for the 1973–1974 school year. Plaintiff turned the job down, not because of salary or travel considerations, but because he did not at the time want to go back to being a mere teacher.

In argument, plaintiff points out that he did apply for teaching positions at various State colleges in the area. This Court would agree that plaintiff would have taken a teaching position at a State college

because of the prestige in working at such a higher level. However, this Court would not agree that plaintiff was prepared at the time to be an elementary or high school teacher at one of the defendants' institutions. It should be noted that plaintiff was never offered a teaching position at any one of the State colleges to which he applied.

Plaintiff seeks to draw inferences of racial discrimination from the fact that Rieman DeWees, a white teacher at MTS; Harold Johnson, a black teacher who later became Assistant Superintendent at MTS; James M. Dean, a white male who became Superintendent at MTS; and Sherman Brett, a white male principal who became Assistant Superintendent at MTS, were all transferred from Victor Cullen after its closing and given jobs at MTS. But as previously discussed, plaintiff was not eligible for the Superintendent or Assistant Superintendent jobs. Furthermore, as the Court has found, plaintiff was not interested in teaching positions at the time. Plaintiff wanted to be a principal or vice principal, but there were no such jobs available at MTS following his lay-off in June 1973. The evidence does not support the contention that Mrs. DeWees became a vice principal at MTS when she came there from Victor Cullen. Quite clearly, she had been demoted to the position of teacher at MTS and was paid as such, after she was laid off at Victor Cullen.

So, for all these reasons, this Court finds no merit to plaintiff's claims that defendants failed to rehire him because of his race.

## V

### The Section 1981 claims

What has been said is likewise applicable to plaintiff's claims asserted under § 1981. This Court has found no discriminatory impact so as to permit plaintiff to recover under Title VII. *A fortiori*, the same findings support the conclusion that plaintiff has not proven any discriminatory motive or intent so as to permit recovery under § 1981 under any of the claims asserted here.

Accordingly, this Court finds that plaintiff's § 1981 claims likewise lack merit.

## VI

### Limitations

Defendants have raised defenses of limitations both as to the Title VII claim of a discriminatory lay-off and as to the § 1981 claim of a discriminatory lay-off. Although not necessary to do so in view of the Court's rulings on the merits, I will also undertake to decide these questions.

Insofar as Title VII is concerned, I would agree with defendants that the 180-day limitations period would bar plaintiff's claim that he was laid off as of June 30, 1973 because of his race. The claim with the EEOC was not filed until March 11, 1974, more than 180 days later. I do not find that the evidence supports plaintiff's contention that he first filed an administrative claim with a state or local Equal Employment agency, so as to give him a 300-day limitations period. Indeed, the evidence here indicates that plaintiff did not file with a state agency first. (*See* Joint Exhibit 181.)

A close reading of *Cox v. U.S. Gypsum Corp.*, 409 F.2d 289 (7th Cir. 1969), indicates that that case does not support plaintiff's position that a lay-off may be a continuing violation, particularly under the facts of this case. When the Court in *Cox* spoke of a "continuing" discrimination, it was concerned with a discriminatory failure to recall by the same employer, not with a discriminatory lay-off, as here. Of course, plaintiff's claims relating to the discriminatory failure of defendants to rehire him are continuing and are not barred by limitations. However, the lay-off here was a one-time event which became final on June 30, 1973, and which resulted from a decision made by entirely different State officials than those involved with the rehiring process.

On the other hand, I find no merit in defendants' claim that the § 1981 cause of action is time-barred. The effective date

of the lay-off was June 30, 1973, and suit was filed June 30, 1976, within the applicable three-year period.

So, for the reasons stated, judgment is hereby entered in favor of the defendants, with costs.