**Sandra DOUGLAS, Plaintiff,**

v.

**James H. EVANS, etc, et al., Defendants.**

**Civil A. No. 94–D–327–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 25, 1996.

---

Algert S. Agricola, Jr., Montgomery, AL, Ann K. Wiggins, Robert L. Wiggins, Jr., C. Paige Williams, Birmingham, AL, for plaintiff.

Robert D. Segall, Montgomery, AL, Kenneth Lamar Thomas, Montgomery, AL, for defendants.

## MEMORANDUM OPINION [1]

DE MENT, District Judge.

Before the court is defendant James H. Evans ("Mr. Evans") and defendant Jeff Sessions' ("Mr. Sessions") motions for summary judgment filed October 2, 1995. Mr. Sessions' motion adopts and incorporates the arguments and positions set forth in Mr. Evans' motion and also addresses the issues arising from the plaintiff's allegations of age and race discrimination. Thus, because the motions involve similar issues and arise from the same set of facts, the court will address them simultaneously. The plaintiff, Sandra Douglas ("Ms. Douglas"), filed a response to both motions on November 6, 1995. After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court finds that the defendants' motions are due to be granted.

## JURISDICTION AND VENUE

Jurisdiction is proper, as the plaintiff alleges violations of 42 U.S.C. §§ 1981 and 2000e et seq. (hereinafter "Title VII"), the Equal Protection and Free Speech clauses of the United States Constitution as made applicable to the states by the Fourteenth Amendment, and 29 U.S.C. §§ 621 et seq., the Age Discrimination in Employment Act.[2] Per-

sonal jurisdiction and venue are not contested.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also*

---

**1.** Sandra Douglas brought this action against James Evans in both his individual and official capacity, as Attorney General of Alabama. Jeff Sessions defeated James Evans in his bid for re-election. Therefore, the action against James Evans in his official capacity passes to Jeff Sessions, as Rule 25 of the *Federal Rules of Civil Procedure*, instructs:

> When a public officer is a party to an action in his [or her] official capacity and during [his or her] pendency ... ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party. Fed.R.Civ.P. 25(d) (brackets added).

**2.** Pursuant to 28 U.S.C. § 1331, the federal district courts have "original jurisdiction of all civil actions arising under the Constitution, laws ... of the United States."

*Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.

### FINDINGS OF FACT

The plaintiff, Ms. Douglas, has served over thirteen years and under three Attorney Generals during her tenure with the Alabama Attorney General's Office. Ms. Douglas has served with distinction as is evidenced by the evaluations she received during her employment. Ms. Douglas has, at all times, worked in the Attorney General's Consumer Utility Section. Ms. Douglas has served as acting director of that section for ten years and supervised attorneys who were assigned to the Consumer Utility Sec-

tion. Although she is unaware of any writing by which she was named permanent director of the Utility Section, she assumes that she became permanent in that assignment. Dep. of Douglas at 31–37. In addition, although she is not a lawyer, the job description of the Utilities Division chief includes preparing briefs for the Supreme Court of Alabama. Dep. of Douglas at 238–39. In fact, Ms. Douglas admits that she has drafted pleadings, written legal appellate briefs and supervised lawyers in connection with such legal work. Dep. of Douglas at 238–39.

From the beginning of his administration, Mr. Evans wanted a lawyer to serve as head of the Utilities Section.[3] Dep. of Evans at 21–22, 26 & 162; Aff. of Turner; Aff. of Pitt. Mr. Evans desired a lawyer because: (1) he believed that only a lawyer could represent the state before the Public Service Commission (Dep. of Evans at 51); (2) the head of the Utilities Section needed to know how to develop a record (Dep. of Evans at 194–96); (3) the head of the Utilities Section needed to know how to present evidence and cross-examine witnesses (Dep. of Evans at 194–96 & 198–200); and (4) the Utilities Section often dealt with legal issues (Dep. of Evans at 88, 91, 162, 194–96 & 198–200). As such, in 1991, shortly after Mr. Evans became Attorney General and months before any issue arose concerning South Central Bell or Bell Advertising and Publishing Corporation, Mr. Evans offered the Utilities Division chief's position to Redding Pitt. Aff. of Pitt. Mr. Pitt, who currently is the United States Attorney for the Middle District of Alabama and who had experience in utilities under Mr. Evans' predecessor, declined the offer. Aff. of Pitt.

In August of 1991, based on an audit conducted by the SEARUC Southern Task Force on BellSouth Corporation and its affiliates, the staff of the Public Service Commission ("PSC") believed that revenues realized by South Central Bell's affiliate, Bell Advertising and Publishing Corporation ("BAPCO"), had not been attributed in the proper amount to South Central Bell. Accordingly,

---

**3.** Mr. James Evans served as Alabama's Attorney General from 1990 to 1994.

on September 20, 1991, the PSC issued an order directing South Central Bell to show cause why it should not refund alleged overcharges and reduce rates in the future. Dep. of Douglas at 97–99.

In October of 1991, Ms. Douglas, in her role as acting chief of the Utilities Division, recommended to Mr. Evans that the Attorney General intervene in this matter. Dep. of Douglas at 99–101; Dep. of Evans at 47–48 & 79–80. Allegedly, the audit substantiated the conclusion reached by Ms. Douglas that Alabama South Central Bell consumers were entitled to a refund of possibly as much as forty million dollars. After consulting with Mr. Evans, regarding this concern, Mr. Evans agreed to take the necessary action to resolve the matter and directed Ms. Douglas to intervene. Dep. of Douglas at 101–103; Dep. of Evans at 79–81. Accordingly, Ms. Douglas filed a notice on Mr. Evans' behalf manifesting his intent to intervene in the action, which was set for hearing in October, 1991. However, the hearing never took place as the PSC canceled the meeting unexpectedly.

In December, 1991, Ms. Douglas claims to have learned that South Central Bell and the PSC were clandestinely engaging in settlement negotiations regarding the BAPCO matter. Dep. of Douglas at 103–04. Consequently, Ms. Douglas requested, and Mr. Evans granted her, permission to take all necessary actions to halt the covert discussions. Dep. of Douglas at 103–04; Dep. of Evans at 133. However, Ms. Douglas never received the opportunity to place her plan into work because the PSC settled the case on January 16, 1992. Ms. Douglas believes that this settlement was not in good faith.

Also in December of 1991, William Mayer ("Mr. Mayer") was hired by the Attorney General's office. Aff. of Mayer. While Mr. Mayer served in the military, he had gained experience in utility-related matters. *Id.* In addition, he had attended a course on utility rate making. *Id.* Mr. Mayer had previously worked with Mr. Evans in the Montgomery County District Attorney's office as a litigator. Dep. of Evans at 36 & 197–98. Mr. Mayer became involved with utility matters in the Attorney General's office, and by Jan-

uary 1992, he was well involved in the BAPCO issues. Aff. of Mayer; Dep. of Douglas.

In early January of 1992, Mr. Evans asked Mr. Mayer to give him an independent evaluation of the BAPCO matter. Aff. of Mayer; Dep. of Evans at 88, 91–92 & 95. In particular, he wanted to know whether there was a good basis for bringing a fraud claim against South Central Bell, as Ms. Douglas contended. Dep. of Evans at 88–89 & 91–92; Aff. of Mayer. Mr. Mayer conducted said evaluation, and determined that there was not a reasonable basis for pursuing a fraud claim against South Central Bell. Dep. of Evans at 92; Dep. of Douglas at 106–08, 115–16, & 95–97. During this time, lawyers for South Central Bell met with Mr. Evans on one or two occasions. Dep. of Evans at 84 & 141; Aff. of Mayer. Although these representatives maintained that South Central Bell had accounted for BAPCO revenue in exactly the manner they should have, Mr. Evans tried to get them to agree to the remedy set forth in the PSC's show cause order; however, this effort was unsuccessful. Dep. of Evans at 84–86, 109, 112–17 & 123.

On January 16, 1992, the PSC issued an order that reflected negotiations conducted between South Central Bell and PSC staff. Dep. of Douglas at 104–06. That order directed a four million dollar reduction in rates and called for no refund. Dep. of Douglas 105–06.

On January 29, 1992, Ms. Douglas asked Mr. Evans about appealing the PSC's order. Aff. of Douglas. Meetings were conducted in which discussions of the issue of whether Mr. Evans should appeal the PSC's order transpired. Mr. Mayer took the position that although the PSC staff might not have performed appropriately, the PSC's decision probably was a correct one (Dep. of Douglas), while Ms. Douglas maintained that further action should be taken (Dep. of Douglas at 164–65). Despite Ms. Douglas' arguments, Mr. Evans decided not to challenge the PSC's order. Aff. of Douglas.

Ms. Douglas strongly disagreed with Mr. Evans' position and began to assemble information which she believed would convince him to change his mind. Aff. of Douglas. In

early February of 1992, Ms. Douglas wrote a memorandum to the Attorney General, with copies to other high level individuals within the Attorney General's office and within the Utilities Division, setting out her position. Dep. of Douglas at 138–39, 215, exh. 7. On February 5, 1992, a meeting was held in Mr. Evans' office to discuss Ms. Douglas' position and the positions held by other people within the Attorney General's office. Dep. of Douglas at 169–72, exh. 6. In this meeting, Ms. Douglas, Mr. Evans and members of Mr. Evans' staff discussed Ms. Douglas' memorandum. Aff. of Douglas. At the conclusion of this meeting, Mr. Evans told Ms. Douglas that he did not feel there was sufficient evidence to proceed and asked her to bring him more evidence. Dep. of Evans at 129 & 135; Dep. of Douglas at 169, vol. 2, 151–52; Aff. of Douglas.

Following these meetings, Ms. Douglas believed that Mr. Evans would not appeal from the PSC's order. Aff. of Douglas. Therefore, within one or two days following the February 5th meeting, she contacted outside counsel to see if anything could be done about the BAPCO issue. Dep. of Douglas at 129, 132–40, 154–59, 166–68 & 219; Dep. of Baxley, Dillard; Dep. of Wise; Aff. of Johnson; Aff. of Douglas. Ms. Douglas told private attorneys that Mr. Evans had wrongfully declined to pursue the matter further. Dep. of Douglas at 156–58. Ms. Douglas also presented her memorandum dated February 3, 1992, to Ronald W. Wise, Esq. Aff. of Douglas. After several meetings with Ms. Douglas, Mr. Wise and several other attorneys concluded that the BAPCO matter merited judicial review. On March 11, 1992, Mr. Wise and several other attorneys then filed an action in the Circuit Court of Montgomery County, Alabama.[4]

On February 5, 1992, Mr. Mayer replaced Ms. Douglas as director of the Consumer Utility Section—a position Ms. Douglas had held for ten years. In making this decision, Mr. Evans had no knowledge that Ms. Douglas had disregarded his direction to bring him more evidence. Mr. Evans also had no

knowledge that Ms. Douglas had consulted with outside counsel and had given internal Attorney General documents to private attorneys. In fact, sometime in late March or early April, Mr. Evans first became aware that Ms. Douglas had taken internal Attorney General documents to private attorneys and that a lawsuit had been filed in the Circuit Court of Montgomery County involving the BAPCO matter. Dep. of Evans at 155, 158–160, 165, 174–75 & 203–04; Aff. of Mayer; Aff. of Johnson.

On March 13, 1992, Ms. Douglas was allegedly told that if she did not accept a transfer to the Consumer Protection Division of the office, Mr. Evans would abolish her position. Mr. Evans told Ms. Douglas that she would have supervisory responsibility in the Consumer Protection Division, with an opportunity ultimately to become director of Consumer Protection. Dep. of Evans at 200; Aff. of Pitt. However, Ms. Douglas refused to transfer voluntarily, and Mr. Evans did not cause her to transfer. Dep. of Douglas, vol. 2, at 212; Dep. of Evans at 168.

Ms. Douglas contends that harassment ensued and has persisted since that day. Ms. Douglas contends that the harassment culminated in her transfer to the isolated surroundings of the Alabama Statehouse basement, where she is allegedly deprived of the congeniality associated with the professional rapport of her colleagues. The alleged harassment has also caused a purported deprivation of meaningful job assignments, ostracism by Mr. Evans, repayment of sick and annual leave before their accrual, loss of reserved parking space and loss of a personal computer at work. Ms. Douglas contends that the aforementioned acts are the fruits of retaliation for voicing her opinion on a matter of public concern.

Mr. Mayer vacated the director of Consumer Utility position in January, 1993. However, Ms. Douglas was not promoted to her former position despite her qualifications. Instead, Anita Young, a newly licensed, younger, black, female attorney, was hired for the position. Thereafter, in June, 1993,

---

4. The lawsuit charged South Central Bell with fraud and deceit in its accounting methods in connection with BAPCO's revenues. However,

the Circuit Court of Montgomery County dismissed the lawsuit. Dep. of Douglas at 176–80; Aff. of Johnson.

Ms. Douglas filed a charge of race and age discrimination against Mr. Evans for failure to promote her to the newly vacated position in January, 1993. Ms. Douglas alleges that the filing of the EEOC charge led to intensified retaliation.

On March 15, 1994, Ms. Douglas instituted the above-styled action and thereafter, amended her complaint on May 3, 1995. She alleges that Mr. Evans' acts amount to violations of the following federal constitutional and statutory provisions: procedural and substantive due process, First Amendment right to engage in free political speech, equal protection clause of the United States Constitution, 42 U.S.C. §§ 1981 and 2000e *et seq.*, and Age Discrimination in Employment Act ("ADEA"). Ms. Douglas also claims that Mr. Evans violated §§ 36–26–10 and 36–26–23 of the *Alabama Code* because the alleged adverse employment decision was not predicated on merit and competition. Ms. Douglas seeks declaratory and prospective injunctive relief against Mr. Sessions in his official capacity and pecuniary damages against Mr. Evans in his individual capacity. Subsequently, Mr. Evans filed a motion to dismiss. On May 12, 1995, the court entered an order dismissing the substantive due process claim and dismissing the Title VII, ADEA and § 1981 claims against Mr. Evans in his individual capacity. The remaining claims consist of: (1) a procedural due process claim; (2) freedom of speech cause of action; (3) Title VII, ADEA and § 1981 claims against Mr. Sessions in his official capacity; and (4) claims arising under Ala.Code §§ 36–26–10(f) and 36–26–23.

## DISCUSSION

### A. *Procedural Due Process*

Mr. Evans and Mr. Sessions argue that Ms. Douglas' procedural due process claim is due to be dismissed as she has no cognizable property or liberty interest at stake. When reviewing a due process claim, the initial inquiry is whether the plaintiff was deprived of a protected property or liberty interest. *Faucher v. Rodziewicz,* 891 F.2d 864, 869 (11th Cir.1990).

"Property interests are not created by the [United States] Constitution but are 'defined by existing rules or understandings that stem from an independent source such as state law' and arise only where the plaintiff demonstrates a 'legitimate claim of entitlement.'" *Polenz v. Parrott,* 883 F.2d 551, 555 (7th Cir.1989) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). Moreover, "[a] public employee enjoys a property interest in his [or her] employment only if he [or she] has an expectation of continued employment created by legislation, contract, or policy." *Lassiter v. Covington,* 861 F.2d 680, 682 (11th Cir.1988) (citing *Board of Regents v. Roth,* 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709–10, 33 L.Ed.2d 548 (1972)). There must be a state statute or ordinance that creates a public employment contract, or there must be some clear practice or mutual understanding that an employee can be terminated or transferred only for "cause." *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). If the employee holds his position only at the "will" of the employer, there is no property interest in continued employment. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

Here, Ms. Douglas states that her expectation in continued employment as the chief of the Utilities Division is rooted in the merit system rules of the State of Alabama. However, it is undisputed that no one has ever held merit system rights to the position of division chief within the Attorney General's office. Dep. of Evans at 24; Dep. of Sessions at 22–24; Aff. of Turner; Aff. of Sessions; Aff. of Ballard. In fact, the Attorney General has always had the prerogative to name whomever he wanted to the division chief positions and to remove whomever he wanted from such positions. Dep. of Evans at 20–24; Dep. of Sessions at 20–24; Aff. of Turner. In general, it is the prerogative of any constitutionally elected officer to choose his staff. Dep. of Sessions at 24.

The court is convinced that the division heads are internal titles that have nothing to do with the merit system. As such, although Ms. Douglas is a merit system employee in the classification of Public Utilities Rate Ana-

lyst II, she had no merit system status in the position she occupied as chief of the Utilities Section of the Attorney General's office. In other words, Ms. Douglas' argument focusing on her status as a merit employee is misplaced, because the merit system does not give her an entitlement to the position of chief of the Utilities Division.

■ Assuming that Ms. Douglas anticipated that she would be made permanent chief of the Utilities Division, the law is clear that a prospective promotion or recommendation for a promotion does not give rise to a property or liberty interest, even for a tenured employee. *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1486 (11th Cir.1992), *cert. denied*, 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993); *Wu v. Thomas*, 847 F.2d 1480, 1485 (11th Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989). Furthermore, " 'property' ... [does not extend] to the purely dignitary or nonpecuniary dimensions of employment." *Swick v. City of Chicago*, 11 F.3d 85, 87 (7th Cir. 1993) (citing *Versarge v. Township of Clinton*, 984 F.2d 1359, 1370–71 (3d Cir.1993)); *see also Hardiman v. Jefferson County Bd. of Educ.*, 709 F.2d 635, 638 (11th Cir.1983). For the foregoing reasons, the court finds that Ms. Douglas has not been deprived of a protected property interest.

■ While property interests exist in entitlement provided for by independent sources of law, liberty interests are broader. 980 F.2d 1354, 1357. As succinctly summarized in *Bank of Jackson County v. Cherry*, 980 F.2d 1354 (11th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 73, 126 L.Ed.2d 42 (1993), the Supreme Court of the United States has stated:

> [Liberty] denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized as essential to

the orderly pursuit of happiness by free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed. This broad conception of liberty encompasses a person's interest in his or her reputation, coupled with the more tangible benefits or entitlement which rest upon a person's good name.

*Id.* at 1357–58 (internal quotations and citations omitted); *see Meyer v. State of Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); *Roth*, 408 U.S. at 572, 92 S.Ct. at 2706; *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). In addition, the Eleventh Circuit has stated that it is reluctant to conclude that "a transfer of an employee, which involves no loss of pay and no loss of rank, deprives [that employee] of a protected liberty or property interest." *Oladeinde*, 963 F.2d at 1485. As stated by the court in *Moore v. Otero*, 557 F.2d 435 (5th Cir.1977),[5]

> [t]he internal transfer of an employee, unless it constitutes such a change of status as to be regarded essentially as a loss of employment, does not provide the additional loss of a tangible interest necessary to give rise to a liberty interest meriting protection under the due process clause of the Fourteenth Amendment.

*Moore*, 557 F.2d at 438 (citations and internal footnote omitted).

■ Thus, to establish a liberty interest, Ms. Douglas must establish that her change in position amounts to a loss of employment and "was attended by stigmatizing charges which 'might seriously damage [her] standing and associations in [her] community' or foreclose '[her] freedom to take advantage of other employment opportunities.' " *Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1187 (11th Cir.1985) (quoting *Clemons v. Dougherty County*, 684 F.2d 1365, 1371 (11th Cir.1982)). More importantly in this case, even assuming that Ms. Douglas was stigmatized by Mr. Evans' action, she must, "in order to establish a violation of the due

---

**5.** The Eleventh Circuit, in the *en banc* decision of *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981.

process clause, [provide evidence] that the stigmatizing fact was 'substantially false.'" *McElwee v. Todd,* 581 F.2d 1182, 1184 (5th Cir.1978) (quoting *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977)); *see also Sims v. Fox,* 505 F.2d 857, 864 (11th Cir.1974) (*en banc* ) (Basic proposition is that the government has not infringed liberty unless it perpetuates untrue charges), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975); *Ortwein v. Mackey,* 511 F.2d 696, 698 (5th Cir.1975); *Estes v. Tuscaloosa County,* 696 F.2d 898, 900 (11th Cir. 1983) ("A liberty interest is infringed only when the government's untrue charges might seriously damage a person's standing and associations in the community or when such charges impair some other protected interest such as employment or first amendment rights."); *Wells v. Doland,* 711 F.2d 670, 676 n. 7 (5th Cir.1983) (As part of the plaintiff's claim that he or she was stigmatized, he or she must show that the charges were false); *Blanton v. Griel Memorial Psychiatric Hosp.,* 758 F.2d 1540, 1544 (11th Cir.1985). For instance, in *Codd,* the plaintiff claimed that the New York City Police Department violated the due process clause in discharging him without a hearing because of a suicide attempt. 429 U.S. at 626–27, 97 S.Ct. at 883–84. The court held that a hearing was not required since the plaintiff did not allege that the employment records concerning the suicide attempt were substantially false. *Id.* at 628–29, 97 S.Ct. at 884–85.

■ Ms. Douglas fails to present any evidence that Mr. Evans made a false charge concerning her employment with the Attorney General's office, and in fact, she does not even assert that Mr. Evans or Mr. Sessions made untrue charges concerning her employment with the Attorney General's office. Her only allegation of wrongful conduct by Mr. Evans was that he improperly demoted her in her job duties in retaliation for her position in the BAPCO matter. She also contends that being asked to train her supervisor by Mr. Sessions held her out to ridicule. Dep. of Douglas at 13–15. Even taking these allegations as true, they do not set forth a false charge made by Mr. Evans or Mr. Sessions. Also, they are not evidence of stigmatizing information. The only information from which the court finds stigmatizing was Ms. Douglas' unauthorized release of internal Attorney General documents. However, she admits doing so. Moreover, the court is not convinced that Mr. Evans knew about the release of documents before he reassigned Ms. Douglas. Consequently, the court finds that Ms. Douglas has not been deprived of a liberty interest.

Based on the foregoing, the court finds that Mr. Evans and Mr. Sessions' motions for summary judgment concerning the procedural due process claim are due to be granted.

### B. *First Amendment*

Ms. Douglas' First Amendment claim, as alleged in her complaint, is that the PSC issued a show cause order to South Central Bell related to BAPCO, postponed the hearing, engaged in secret negotiations with South Central Bell, and issued an order paring down the amount of the rate reduction proposed by the commission staff. Ms. Douglas disagreed with the order and urged Mr. Evans to appeal or take some other action. As a result of her advocacy of pursuing action against South Central Bell, Ms. Douglas alleges that six weeks later she was removed from her position as acting chief of the Utilities Division and suffered other forms of retaliation.

■ It is established in the Eleventh Circuit that "[a] state may not demote or discharge a public employee in retaliation for public speech." *Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1539 (11th Cir.1994) (quoting *Morgan v. Ford,* 6 F.3d 750, 753–54 (11th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994)). However, "a public employee's right to freedom of speech is not absolute." *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir.1989) (citing *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). Consequently, the Eleventh Circuit employs a four-prong analysis to determine whether a public employee experienced an adverse employment action predicated on the employee's speech. *Bryson,* 888 F.2d at 1565 (citing *Kurtz v. Vickrey,* 855 F.2d 723 (11th Cir.1988)).

The initial tier of the *Bryson* test asks whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." *Bryson*, 888 F.2d at 1565 (quoting *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2897) (citation omitted). If the plaintiff's speech is a matter of private concern and does not address issues of public relevance, it warrants no First Amendment protection. *Tindal*, 32 F.3d at 1539 (citing *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)). No First Amendment safeguards are affixed to dialogue that exposes personally experienced adversity for personal benefit. *See, e.g., Morgan*, 6 F.3d at 754–55 (citations omitted). The court must scrutinize the content, form, and context of the employee's speech to assess its public worth. *Bryson*, 888 F.2d at 1565 (citing *Rankin*, 483 U.S. at 384–85, 107 S.Ct. at 2897).

The second part of the *Bryson* test inquires whether a public employee's interest in his or her speech outweighs the state's interest in promoting efficient service. *Bryson*, 888 F.2d at 1565 (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). The analysis at this prong hinges on the magnitude of disruption Ms. Douglas' speech would have on the efficiency of government activity. Therefore, Ms. Douglas is entitled to no First Amendment protection if her speech "so severely impeded [her] own effectiveness and the effectiveness of [the Attorney General and his staff] that the governmental interest at stake in this case clearly outweigh[ed Ms. Douglas'] speech interest." *Morales v. Stierheim*, 848 F.2d 1145, 1151 (11th Cir.1988), *cert. denied sub nom. Leon v. Avino*, 489 U.S. 1013, 109 S.Ct. 1124, 103 L.Ed.2d 187 (1989).

The third stage of analysis in the *Bryson* test is a determination by the factfinder as to "whether the employee's speech played a 'substantial part' in the government's decision to demote or discharge the employee." *Bryson*, 888 F.2d at 1565 (citing *Mt. Healthy City School Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Thus, while the court must determine the first two stages as a matter of law, to survive summary judgment on the third stage, Ms. Douglas need only present sufficient evidence to raise a question of fact to be settled by a jury. *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir.1995).

The fourth and final determination which needs to be made under *Bryson* is whether the employer would have made the same decision even in the absence of the protected speech. *Bryson*, 888 F.2d at 1566 (citing *Mt. Healthy*, 429 U.S. at 286, 97 S.Ct. at 575). However, whether the employer has met this burden is a question for the trier of fact. *Beckwith*, 58 F.3d at 1564; *see also Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (issues of discriminatory intent and actual motivation are questions of fact for the trier of fact).

Concerning the first component of the *Bryson* test, Mr. Evans and Mr. Sessions contend that Ms. Douglas' speech was not a matter of public concern because it was expressed only to individuals within the Attorney General's office. Def. Evans' Mot. for Summ. J. at 25–26. However, as noted above, the court must look to whether the content, form, and context of a given statement addresses a matter of public concern. *Rankin*, 483 U.S. at 384–85, 107 S.Ct. at 2897. In *Rankin*, the Supreme Court of the United States concluded that a remark, regarding an attempt on the President's life made by a clerical employee in a county constable's office to another clerk whom she was dating, addressed a matter of public concern. *Id.* at 386, 107 S.Ct. at 2897. The fact that the statement was not made publicly did not alter the Court's determination.

The court finds that Ms. Douglas' speech is as much a matter of public concern as that of the plaintiff in *Rankin*. In *Rankin*, the public employee was merely stating her personal opinion while at work. Although her specific job-related responsibilities in no way concerned the object of her voiced opinions, her statements, if true, would affect the interests of the citizens of the United States. Thus, it addressed a matter of public concern. Here, Ms. Douglas was chief of the Utilities Division of the Attorney General's office, which

obligated her to protect the public interest. As such, the content of her speech also concerned protecting the interests and rights of the citizens of Alabama. Moreover, her remarks were made to individuals with the authority to proceed on behalf of the public.

■ Once the court is satisfied that the speech addresses a matter of public concern, its next task is to weigh "the employee's [F]irst [A]mendment interests against 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Bryson*, 888 F.2d at 1565 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734). The more substantially a public employee's speech involves matters of public concern, the greater the disruption of the state's interests is required to justify an adverse employment decision. *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692.

■ Ms. Douglas argues that Mr. Evans has not even attempted to identify a disruption in the Attorney General's office caused by her opinion regarding the BAPCO matter. Ms. Douglas does not dispute the fact that Mr. Evan's was not aware of her communication with outside attorneys prior to her demotion. However, she does contend, and in fact Mr. Evans admits, preventing her from receiving confidential information because she communicated with outside attorneys about the BAPCO matter.

The court is persuaded by the Eleventh Circuit's reasoning set forth in *Bates v. Hunt*, 3 F.3d 374 (11th Cir.1993), where the First Amendment was addressed in the employment context between the Governor of Alabama and a member of his staff:

> The Governor of Alabama is elected to lead and to serve the state and its people— a mission of extraordinary importance. If he is to be successful in this difficult mission, he must make effective use of his limited staff. And the Governor need not allow events to unfold to the point where disruption and inefficiency in the Governor's office become open and obvious, before he constitutionally can discharge an employee. *See Connick*, 461 U.S. at 151–52, 103 S.Ct. at 1692.

3 F.3d at 378 (internal footnote omitted) (holding plaintiff had no right to continue as Governor's assistant because her acts were hostile to the Governor). Similarly, the Attorney General is elected to "lead and to serve the state and its people."

Here, the court finds that Ms. Douglas' First Amendment interest as a citizen does not outweigh the interest of the Attorney General, as an employer, in promoting the efficiency of the services he provided to the public or in superintending all litigation involving the interests of the state. It is undisputed that Ms. Douglas presented one or more internal Attorney General documents that Mr. Evans considered confidential to outside counsel. *See* Def. Evans Mot. for Summ. J. at ¶¶ 18–21. It is also undisputed that Ms. Douglas failed to follow Mr. Evans' direct instruction to bring him further evidence. Instead, she secretively met with private attorneys asking that they pursue the BAPCO matter. Moreover, she falsely told the private attorneys that Mr. Evans had wrongfully declined to pursue the matter further. Dep. of Douglas at 156–58. In addition, during the time she was distributing confidential Attorney General information to the private attorneys, she discussed with one of those attorneys the possibility of going to work for him. Aff. of Johnson; Dep. of Baxley, Dillard Custodian at 1; Dep. of Douglas at 114 (according to Ms. Douglas, said attorney was lead attorney in the private PSC court action).

The court finds that the conduct engaged in by Ms. Douglas disrupted the efficient operation of the Attorney General's office. It clearly interfered with the order that must prevail in a law enforcement agency. In fact, the court believes that such acts could destroy the morale of the Attorney General's office by holding the Attorney General up for ridicule and disrespect—i.e., lending support that the Attorney General is not the ultimate decision-maker or the one in charge. Hence, the subversion of the Attorney General by one division chief could encourage similar actions by other division chiefs. Because the court finds that Ms. Douglas' actions disrupted the efficient operation and order of the Attorney General's office, the court concludes that Mr. Evans' precautions in providing Ms.

Douglas access to confidential information were fully justified under the circumstances.

Moreover, the court finds that even if there were evidence showing that Ms. Douglas was removed from her position because of serious disagreements with Mr. Evans about the BAPCO matter, her removal would not implicate the First Amendment. As succinctly stated in *Bates, supra*, from which the court quotes: "For some categories of employees such as those in a confidential or policy-making relation to their public employer, First Amendment constitutional protection is often slight." 3 F.3d at 378. Here, it is abundantly clear that the chief of the Utilities Division is a policy making position, which entails a confidential relationship with the Attorney General. It is important, therefore, that the person who occupies the position of chief of the Utilities Division share a common vision with the Attorney General on policy issues. Hence, Mr. Evans could have discharged Ms. Douglas even before disruption and inefficiency became open and obvious. *See id.* Since Ms. Douglas' employment could have been terminated as a result of her misconduct, the court finds that merely limiting her involvement in particular cases and changing her office space does not implicate the First Amendment.

For the foregoing reasons, Mr. Evans and Mr. Sessions' motions for summary judgment are due to be granted concerning Ms. Douglas' First Amendment claim. Therefore, the court need not reach the remaining components in the *Bryson* test.

### C. Employment Discrimination Claims

#### 1. Title VII

Title VII forbids discrimination on the basis of sex, race, or national origin in a wide range of employment practices, including hiring, discharge, and promotion. *Batey v. Stone*, 24 F.3d 1330, 1333 (11th Cir.1994)

(citing *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992)).[6] The theory of "disparate treatment" has been stated by the Supreme Court of the United States as follows:

> [Disparate treatment is] the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. [citation omitted]. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

*International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Thus, the essence of disparate treatment is different treatment: that blacks are treated differently than whites; women differently than men.

In order for Ms. Douglas to prevail on a Title VII claim she must show that Mr. Evans intentionally discriminated against her when making the employment decisions which gave rise to the suit. In reverse discrimination actions, the plaintiff need not adduce evidence of direct discrimination, but, instead, may construct a prima facie case, which raises a presumption of unlawful discrimination. *See generally, McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* test requires a reverse discrimination plaintiff to demonstrate: 1) that he or she belongs to a class; 2) that he or she was qualified for a job; 3) that he or she was removed from the job/position; and 4) that said position was filled by a minority. *See Wilson v. Bailey*, 934 F.2d 301, 304 (11th Cir.1991).[7]

---

**6.** 42 U.S.C.A. § 2000e–2(a)(1) (West 1981) provides: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."

**7.** The Eleventh Circuit has repeatedly emphasized that an overly strict formulation of the components of a prima facie case is to be avoided. *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1555 n. 12 (11th Cir.1995); *Carter v. City of Miami*, 870 F.2d 578, 583 (11th Cir.1989). The analysis is fact specific: "would an ordinary person reasonably infer discrimination if the facts presented remained unrebutted?" *Id.*

■ Once the Ms. Douglas satisfies her burden by demonstrating a prima facie case of discrimination, a presumption of impermissible discrimination arises. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The burden of production then shifts to Mr. Sessions [8] to articulate a legitimate nondiscriminatory reason for the adverse employment decision. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 248, 101 S.Ct. at 1090. Should Mr. Sessions fail to meet his burden of production once Ms. Douglas demonstrates prima facie discrimination, "the unrebutted presumption of discrimination stands." *Turnes v. AmSouth Bank, NA,* 36 F.3d 1057, 1061 (11th Cir.1994) (citing *Joshi v. Florida State University Health Ctr.,* 763 F.2d 1227, 1236 (11th Cir.), *cert. denied,* 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 293 (1985)).

The Eleventh Circuit has determined that this intermediate burden is "exceedingly light." *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1019 (11th Cir.1994) (quoting *Perryman v. Johnson Prods. Co.,* 698 F.2d 1138, 1142 (11th Cir.1983)). Thus, to overcome the presumption of discrimination demonstrated by the plaintiff-employee, the defendant-employer "need only offer admissible evidence sufficient to raise a genuine issue of material fact as to whether it had a legitimate reason for not hiring the plaintiff." *Turnes,* 36 F.3d at 1061 (citing *Hill v. Seaboard Coast Line R.R. Co.,* 767 F.2d 771, 774 (11th Cir.1985)).

■ In the case at bar, the court acknowledges that Ms. Douglas belongs to a class—Caucasian. The court also finds that she was denied a position and that said position was filled by a black female. However, the court fails to find that Ms. Douglas was qualified for the position.

It is undisputed that Ms. Douglas holds a Bachelor's degree and two Master degrees, and also has been a teacher. It is also undisputed that Ms. Douglas received, routinely, above average evaluations. However, the chief of the Utilities Division must submit briefs, analyze appellate cases, understand statutes and case authority cited by utility lawyers, present witnesses and conduct hearings before the PSC. Dep. of Sessions at 52–54. In addition, the job description of the Utilities Division chief includes preparing briefs for the Supreme Court of Alabama. Def. Evans' exh 16 at 238–39. It is the court's opinion that only a licensed attorney can legally perform these functions. In fact, from the beginning of his administration, Mr. Evans wanted a lawyer to serve as the head of the Utilities Section (Dep. of Evans at 21–22, 26 & 162; Aff. of Turner; Aff. of Pitt.), and the present Attorney General, Mr. Sessions, agrees. Dep. of Sessions at 33 & 49–54.

Ms. Douglas admits that she has drafted pleadings, has written legal appellate briefs and has supervised lawyers in connection with such legal work. Dep. of Douglas at 238–39. The court notes that, if true, this activity by a non-lawyer constitutes the unauthorized practice of law, which, if assisted by a lawyer, is a violation of Rule 5.5 of the *Alabama Rules of Professional Conduct.* Because Ms. Douglas was not an attorney, the court finds that she was not qualified for the position of Chief of the Utilities Division.

■ Moreover, the Chief of the Utilities Division holds a policy-making position, which bears a relationship of trust and confidence to the Attorney General. Dep. of Evans at 204; Dep. of Douglas at 42–47 & 285–86; Aff. of Sessions; Aff. of Mayer; Aff. of Turner. The chief of the Utilities Division answers directly to the Attorney General, (Dep. of Douglas at 39–40, 56–57), and advises him on policy decisions related to matters pending before the PSC. Dep. of Douglas at 39–45 & 285–86; Dep. of Evans at 48, 80–81 & 88. As emphasized, *supra,* if the Attorney General is to be successful in his difficult mission to lead and serve the state and its people, he must make effective use of his limited staff.

Ms. Douglas has, by her own admission, taken sensitive material prepared for the Attorney General to unauthorized private attorneys because she disagreed with the decision of the Attorney General regarding a sensitive

---

**8.** As stated earlier, pursuant to Rule 25 of the *Federal Rules of Civil Procedure,* the action against Mr. Evans in his official capacity passes to Mr. Sessions.

and ongoing matter. In fact, she disobeyed the Attorney General's orders to bring him more evidence. Her action in so doing precipitated a futile lawsuit, which foreclosed further action by the Attorney General in the matter. Clearly, Ms. Douglas cannot function as a high-level advisor to the Attorney General in whom he can repose trust and confidence.

■ Because Ms. Douglas did not make out a prima facie case, she cannot prevail merely by showing that the articulated reason for her termination was probably not the true reason. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984). However, notwithstanding Ms. Douglas' failure to establish a prima facie case, the court also finds that Ms. Douglas has failed to produce any evidence that demonstrates her race was the motivation for the decision to discharge her from employment.

Mr. Sessions' articulated, legitimate reason is that the job was offered to an employee who was more qualified than Ms. Douglas. As revealed in her response to the motion for summary judgment, Ms. Douglas disagrees and believes that the reasons given for her denial of promotion are unworthy of credence.

In fact, Ms. Douglas claims that the Supreme Court of the United States in *St. Mary's* permits the trier of fact to infer intentional discrimination upon the rejection of the defendant's proffered reasons. Pl.'s Br. in Opp. to Mot. for Summ.J. at 28–29. As a result, Ms. Douglas concludes that the evidence presented by her demonstrates that Mr. Sessions' explanations given for the denial of promotion are false and, thus, are sufficient to establish pretext and avoid summary judgment.

*St. Mary's* slightly modified the Title VII disparate treatment framework. Previously, a plaintiff could satisfy his or her Title VII burden of proof "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of belief." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *see Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1529 (11th Cir.1992)

(plaintiff satisfied burden by showing that employer's reasons were unworthy of credence); *Caban–Wheeler v. Elsea,* 904 F.2d 1549, 1554 (11th Cir.1990) (same). In other words, "the falsity of the employer's explanation [was] *alone enough* to compel judgment for the plaintiff." *St. Mary's,* 509 U.S. at 517, 113 S.Ct. at 2752 (emphasis supplied). In *St. Mary's,* however, the Supreme Court of the United States ruled that if "the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens— is no longer relevant." *Id.* at ——, 113 S.Ct. at 2749. Instead, the only inquiry becomes "whether [the] plaintiff has proven 'that the defendant intentionally discriminated against [him]' because of his [age]." *Id.* (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).

Thus, Ms. Douglas must show "*both* that the reason was false, *and* that discrimination was the real reason" ... and "it is not enough ... to disbelieve the employer...." *Id.* at 511 n. 4, 113 S.Ct. at 2749 n. 4 (emphasis supplied). Here, Ms. Douglas presents no evidence from which the court could infer racial discrimination. She only asserts that the time during which Mr. Evans chose to demote her and the manner in which he did so raise at least an inference of intent. First, Mr. Evans demoted Ms. Douglas well before the black female, Anita Archie, was promoted to the position that Ms. Douglas sought. Second, at the time Ms. Douglas was allegedly demoted, a white male, William Mayer, was appointed chief of the Utilities Division.

Because the court finds that race played no role whatsoever in the decision not to promote Ms. Douglas to chief of the Utilities Division, Mr. Sessions' motion for summary judgment addressing Ms. Douglas' allegation of a Title VII violation is due to be granted.

## 2. *Section 1981*

■ Ms. Douglas also alleges that she was racially discriminated against in violation of 42 U.S.C. § 1981. Section 1981 prohibits race discrimination in making and enforcing contracts and is a statutory remedy available

in both private and public sectors.[9] *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). Prior to the 1991 amendments to the Civil Rights Act of 1964, the United States Supreme Court narrowly construed the right "to make and enforce contracts" clause of § 1981(a). In *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Court held that § 1981 "covers conduct only at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through the legal process." Thus, conduct affecting "the terms and conditions of continuing employment" was not actionable. *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1160 (11th Cir.1993) (quoting *Patterson,* 491 U.S. at 179, 109 S.Ct. at 2374).

■ In 1991, the Civil Rights Act (hereafter the "Act") was amended, expanding the coverage of 42 U.S.C. § 1981 to include claims of racial discrimination based upon wrongful termination. Pub.L. No. 102–166, S. 1745, 102d Cong., 1st Sess. (1991) (Congress passed the Act on November 7, 1991, which was signed into law on November 21, 1991, by former President George Bush.). The Act effectively reverses *Patterson* and its progeny and now permits claims for intentional racial discrimination in " . . . the making, performance, modification, and termination of [employment] contracts," as well as " . . . the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Hence, the Act maximizes the overlap between Title VII and § 1981 and allows an aggrieved party alleging intentional discrimination to alternatively seek recourse under both statutes. Thus, § 1981 protects all persons, Caucasian and non-Caucasian alike, from racially motivated abridgements of the right to contract equally. *See Robertson v. Maryland State Dep't of Personnel,* 481 F.Supp. 108 (D.Md. 1978).

■ Ms. Douglas' claim under § 1981 requires proof of intentional discrimination. *General Bldg. Contractors Ass'n., Inc. v.*

*Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Washington v. Davis,* 426 U.S. 229, 246–48, 96 S.Ct. 2040, 2050–52, 48 L.Ed.2d 597 (1976); *Baldwin v. Birmingham Bd. of Educ.,* 648 F.2d 950, 954 (5th Cir.1981). The court recognizes that the test for intentional discrimination in suits under § 1981 is the same as the framework used in Title VII discriminatory treatment cases. *Ross v. Buckeye Cellulose Corp.,* 980 F.2d 648, 656–57 (11th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 69, 130 L.Ed.2d 24 (1994); *Brown v. American Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir. 1991), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992) (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 185– 87, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989)). Since the Title VII and § 1981 are inextricably intertwined, the court will not conduct a separate analysis of the § 1981 claim. Therefore, based on the above Title VII analysis, the court finds that Ms. Douglas has failed to establish a prima facie case of a § 1981 violation.

### 3. *ADEA*

■ In an action alleging disparate treatment under the ADEA, a plaintiff must prove an intentional discriminatory motive by presenting either direct or circumstantial evidence of age discrimination. *St. Mary's,* 509 U.S. at 519–20, 113 S.Ct. at 2754; *see e.g., Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 771–72 (11th Cir.1982). Essentially, "[a] plaintiff may establish a prima facie case of age discrimination in one of three ways: (1) with direct evidence, (2) with circumstantial evidence, or (3) with statistical evidence." *Corbin v. Southland Int'l Trucks,* 25 F.3d 1545, 1548 (11th Cir.1994) (citing *Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497, 1500 (11th Cir.1991)). Absent direct or statistical evidence, as is the case here, a plaintiff can establish intentional discrimination under a variation of the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

---

**9.** *42 U.S.C. § 1981 provides in part: "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and* Territory to make and enforce contracts . . . as is enjoyed by white citizens."

(1973)[10] and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Under this framework, Ms. Douglas must first raise an inference of discrimination by establishing a prima facie case. *Batey v. Stone*, 24 F.3d 1330, 1333 (11th Cir.1994) (citation omitted). Prima facie proof of age discrimination in promotion cases requires Ms. Douglas to show: (1) that she belongs to a protected group; (2) that she applied for and was qualified for the position for which the employer was seeking applicants; (3) that she was denied the promotion; and (4) that another equally or less qualified individual outside the protected class received the promotion. *Batey*, 24 F.3d at 1334 n. 11 (*citing Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989)); *see Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990).

Under the ADEA, as opposed to Title VII race and sex claims, Ms. Douglas does not necessarily have to show that the employer filled the position with someone outside the protected age group. As explained in *Corbin, supra:* "The plaintiff in an age discrimination case may establish a prima facie case merely by establishing that his [or her] replacement was younger than he [or she but over forty years old], provided that the discrepancy between the ages, along with any other relevant evidence, is sufficient that a fact finder could reasonably infer age discrimination." *Id.* at 1549 (brackets added).

It is undisputed that Ms. Douglas is a member of a protected group (i.e., over the age of forty) and that she applied for, and was refused, the position of chief of the Utilities Division. However, as discussed *supra*, the court finds that Ms. Douglas was not qualified for the position she sought.[11] Notwithstanding this determination, the court

also finds that the record is devoid of any evidence inferring age discrimination. Age must be "a determinative factor in the employer's decision, though it need not have been the sole factor." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987); *see also Monroe v. United Air Lines, Inc.*, 736 F.2d 394, 402 (7th Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1356, 1357, 84 L.Ed.2d 378 (1985) (circuit approval for "a determining factor" jury instruction); *Cuddy v. Carmen*, 694 F.2d 853, 857–58 (D.C.Cir.1982) (Plaintiff must "show by a preponderance of the evidence that age was 'a determining factor' in the employer's decision" or that age "made a difference."). Ms. Douglas has not presented any evidence that the articulated reason for the failure to promote her is actually a cover-up for age discrimination. Because age was not a factor in the decision not to promote Ms. Douglas, the court finds that Mr. Sessions' motion for summary judgment concerning age discrimination is due to be granted.

#### D. *State Law Claim*

Because the foregoing reasons are sufficient to support summary judgment, the court need not address the remainder of the defendants' contentions regarding the statute of limitations and qualified immunity. However, the court will address whether it will exercise supplemental jurisdiction over the remaining state claim, which is brought under Ala.Code §§ 36–26–10(f) and 36–26–23. Mr. Evans and Mr. Sessions contend that the court should decline jurisdiction and permit the state courts of Alabama to consider the state claim.

The Judicial Improvements Act of 1990, Pub.L. No. 101–650, 104 Stat. 5089, substantially altered the law concerning ancillary and pendent jurisdiction. The Act creates, as 28 U.S.C. § 1367, a new provision concerning "supplemental jurisdiction." This

---

**10.** While *McDonnell Douglas* involved a discrimination claim under Title VII, a variant of its analysis applies to claims under the ADEA as well. *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir.1991) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990)); *see also Corbin v. Southland Int'l Trucks*, 25 F.3d 1545, 1549 (11th Cir.1994).

**11.** Since Title VII and the ADEA are inextricably intertwined, the court will not conduct a detailed analysis of Ms. Douglas' qualifications in connection with her ADEA claim.

provision codifies and revises the law that had developed under the labels "pendent" and "ancillary" jurisdiction. Specifically, subsection (a) of § 1367 dictates that as long as a federal district court has original jurisdiction of a claim, the court

> shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

The court stresses that the Act makes supplemental jurisdiction mandatory unless there is a specific statutory exception. One such exception provided in subsection (c) of § 1367 states:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) *the district court has dismissed all claims over which it has original jurisdiction,* or
>
> (4) in exceptional circumstances, where there are other compelling reasons for declining jurisdiction.

In accordance with the foregoing authority, since *no claims remain from which the court had original jurisdiction, the court shall dismiss the remaining state claim without prejudice.*[12]

### CONCLUSION

For the foregoing reasons, the court finds that defendants James H. Evans and Jeff Sessions' *motions for summary judgment relating to the federal claims are due to be granted.* The court further finds that the remaining state claim in this case is due to be *dismissed without prejudice. A judgment in* accordance with this memorandum opinion will be entered separately.

---

12. The court does not consider whether the statute of limitations has run on Ms. Douglas' state law claim as "subdivision (d) of § 1367 recognizes the serious statute of limitations problems a claim may face after it has been 'declined' in a federal action." 28 U.S.C. § 1367 (quoting Practice Commentary at p. 836). Specifically, subdi- vision (d) recognizes that "it may now be too late under the state statute of limitations to bring a state action on the claim." *Id.* Therefore, subdi- vision (d) provides "that the [plaintiff] shall have at least a 30–day period [to file] the state action after it is dismissed by the federal court." *Id.*