**Dr. Leanna WALTON, Plaintiff,**

v.

**DOUGHERTY COUNTY SCHOOL SYSTEM, Defendant.**

**No. 1:97–CV–106–1(WLS).**

United States District Court, M.D. Georgia, Albany Division.

June 20, 1997.

Eugene C. Black, Jr., Albany, GA, for Leanna Walton, Dr., plaintiff.

William Alfred Erwin, Albany, GA, Daniel Robert Murphy, Albany, GA, for Dougherty County School System, defendant.

## ORDER

SANDS, District Judge.

Plaintiff Dr. Leanna Walton ("Walton") has filed this action to recover compensatory damages and injunctive relief against Defendant Dougherty County School System ("the School System") for allegedly discriminating against her because of her race, and thereby violating her civil rights protected by federal law. 42 U.S.C. §§ 1981, 2000e, *et seq.* In her complaint, Walton alleges that the School System engaged in unlawful race discrimination against her in the course of selecting the candidate to be the Assistant Superintendent of Elementary Education in the summer of 1995. Specifically, Walton alleges that she held superior qualifications, understood in terms of both her formal education and professional training, "subjective qualifications," and experience than the person ultimately selected by the School System, namely Dr. Jewel Faison ("Faison"). Compl. ¶ 10. Walton seeks to recover actual damages, measured in terms of her lost wages and benefits, and compensatory damages for her future pecuniary losses, emotional pain, suffering, inconvenience, and mental anguish. Pre-Trial Order ¶ 11. Furthermore, Walton has urged the Court to grant her equitable relief, although the precise terms of her desired injunction are unclear.[1]

The Court conducted a non-jury trial on October 22–26, 1998. After carefully considering the evidence presented at trial and listening to the parties' arguments in support of their respective claims, the Court finds in favor of the School System

---

1. Plaintiff has defined her prayer for injunctive relief as follows: "Counsel would suggest that equitable relief be considered in this case in any and all events. Plaintiff suggests that such relief could discourage overt board interference or pressure in the employment process; thereby coincidentally giving Dr. Culbreath [Superintendent to the School System] a free reign to exercise his professional discretion in managing the school system. While his decisions would be ultimately subject to board approval, some well-crafted injunctive relief could serve to insulate Dr. Culbreath's executive decision making from inappropriate political or racial pressures that bear upon the board. These pressures unfortunately serve as the basis for improperly pressuring Dr. Culbreath and the professional staff such as Dr. Manning. These are general suggestions, though the Plaintiff contends that the problem is obvious and yet, *with a little judicial encouragement,* the board could be encouraged to leave day to day operations to the professional staff." Pl.'s Post–Trial Br. (Doc. No. 32) at 9 (emphasis added).

and against Walton on all of her claims of unlawful race discrimination, as alleged in her complaint.

## FINDINGS OF FACT

The Court finds the pertinent facts of this case as follows:

1. Walton is a white female who, at all times relevant to this action, resided in Albany, Georgia.

2. The Dougherty County School System is a Georgia school district charged with the administration of the public school system in Dougherty County, Georgia, and is within the Middle District of Georgia. The School System is a covered "employer" under Title VII. 42 U.S.C. § 2000e(h).

3. The Board of Education ("the Board") of the School System consists of seven elected representatives. During the relevant period encompassed by the claims embraced in the complaint, the members of the Board were: Mr. Robert Cross, Mrs. Jerry Plowden, Mrs. Christine Blaylock, Mr. Charles E. Clark, Mr. Ozell S. Kelley, Sr., Mr. Michael Windom, and Mr. Lamar Reese. *See, e.g.,* Compl. ¶ 4 ("summer of 1995").

4. In the summer of 1995, a vacancy arose for the position of Assistant Superintendent for Elementary Education in the School System ("Assistant Superintendent position"). The "Qualifications and Duties" of the Assistant Superintendent position were adopted by the Board in 1983, and listed the following:

   A. Master's degree or higher;
   B. Valid Administrator's Certificate;
   C. Knowledge of programs and problems in the area of elementary education;
   D. Public relations skills;
   E. Experience in elementary schools. Def.'s Ex. No. 8.

   The vacancy announcement advertised substantially the same qualifications for the position, except it described the educational level needed as a "master's degree or higher with a major in educational administration." Pl.'s Ex. No. 9.

5. Dr. John Culbreath ("Culbreath"), who is the Superintendent of the School System, asked the Assistant Superintendent, Dr. Michael Manning ("Manning") and the Associate Superintendent, Dr. Alfredo Stokes ("Stokes"), to serve with him on an interview committee to select the candidate for the Assistant Superintendent position. Test. of. J. Culbreath.

6. Culbreath assumed his duties as Superintendent in July of 1995. Culbreath is black. Test. of J. Culbreath.

7. Manning assumed his duties as Assistant Superintendent since the summer of 1995. Manning is white. Test. of M. Manning.

8. Stokes was the Associate Superintendent for Curriculum in the School System from 1979 to June of 1996. Stokes was black. Stokes died in June of 1996. Test. of J. Culbreath.

9. Several individuals applied for the Assistant Superintendent position, including Walton and Faison. Test. of J. Culbreath.

10. Walton was hired as a teacher by the School System in 1964. From 1964 to 1977, Walton taught children in the first grade. In 1977, Walton became the principal at Palmyra Elementary School. She worked for the School System in that position for each of the following eighteen years, before applying for the Assistant Superintendent position. Test. of L. Walton; Pl.'s Ex. No. 1.

11. Walton had experience in writing curriculum guides; she represented the School System on the Professional Standards Commission; she also served on the National Accreditation of Teacher Education Program. Test. of L. Walton; Pl.'s Ex. No. 1.

12. Walton received her B.S. degree in early childhood education from Geor-

gia Southern in 1964, her M.A. degree in elementary school education from Georgia Southern in 1968, and her Ph.D. degree in education administration from Georgia Southern in 1990. Test. of L. Walton; Pl.'s Ex. No. 1. Walton holds a Level Seven Georgia Educator Certificate, issued by the Georgia Professional Standards Commission, and also was certified in elementary grades education. Pl.'s Ex. No. 6; Test. of J. Culbreath.

13. Faison received her B.A. degree in sociology from Spelman College in 1977, and she has earned three graduate degrees from Emory University, including an M.Ed. degree in Middle Grades Education, which she received in 1989, a Diploma of Advanced Studies in Teaching in Administration and Supervision, which she received in 1993, and a Ph.D. degree with a concentration in Higher Education, which she received in 1995. Faison is a black female. Test. of J. Faison; Def.'s Ex. No. 34.

14. Culbreath considered the graduate program in education at Emory University to be sterling and regarded Faison's training in that program as adding value to her experience in education. Test. of J. Culbreath.

15. Faison holds a Level Seven Georgia Educator Certificate, issued by the Georgia Professional Standards Commission. Test. of J. Faison; Def.'s Ex. No. 17.

16. A person who holds a Level Seven Georgia Educator Certificate, issued by the Georgia Professional Standards Commission, is certified to be qualified to work in a supervisory position at both the school level and the system level in a public school system in Georgia. Test. of J. Culbreath.

17. Prior to applying for the Assistant Superintendent position, Faison had worked as a teacher, assistant principal, curriculum specialist, researcher and consultant. From August 1985 until August of 1988, Faison served as a fourth and fifth grade teacher. The fourth and fifth grades are elementary school grades in the Dougherty County School System. While employed in the Atlanta school system, Faison held positions of system-wide responsibility, including serving as a curriculum specialist and assistant principal in the Department of Elementary Education between 1991 and 1994, though she was on an educational leave of absence for part of that time. Test. of J. Faison; Def.'s Ex. No. 19. Through her work in the Atlanta school system and as a consultant, Faison demonstrated an expertise in the area of quality enhancement and management in connection with leadership training for teachers and elementary principals.[2] Test. of J. Faison; Test. of J. Culbreath; Def.'s Ex. No. 34.

18. Faison also held experience developing school programs together with community groups through her work with the Next Generation Schools Project for the Atlanta school system. Test. of J. Faison; Def.'s Ex. No. 34; Test. of M. Manning (explaining how the committee reviewed her vitae).

19. The committee interviewed several candidates, including Walton and Faison. Test. of M. Manning; Test. of J. Culbreath; Def.'s Ex. Nos. 12, 13.[3]

20. Manning recommended Faison to the Board for the Assistant Superintendent position. Test. of M. Manning.

21. Culbreath retained the sole discretion to determine the candidate he would nominate to the Board. According to the employment process in the School System, which was followed to hire

---

**2.** Walton has acknowledged that the breadth of each candidate's experience is a legitimate consideration in filling the Assistant Superintendent position. Test. of L. Walton.

**3.** Walton testified that she did not believe that any of the members of the interview committee held anything against her personally. Test. of L. Walton.

the person for the Assistant Superintendent position, the Superintendent recommends a candidate to the Board, and the Board hires upon the Superintendent's recommendation. Test. of J. Culbreath.

22. For the twenty-five years of her career preceding her application for the Assistant Superintendent position, Walton held two positions, namely, first-grade teacher at Turner Elementary and principal at Palmyra Elementary, both of which are in the School System. Walton served in leadership positions in the National Council of Accreditation for Teacher Education, an organization which reviewed teacher training programs, and Delta Kappa Gamma International, an organization whose mission it is to promote education. Pl.'s Ex. No. 1; Test. of L. Walton.

23. Manning believed that the School System needed to hire a "change agent," that is, a person who would be willing to accept different assignments without fear. Manning was very impressed with Faison's experience in the Atlanta school system, as well as her communication skills, and believed that she was the best qualified applicant to be such a change agent for the School System. Conversely, Manning found Walton to be less qualified to change the programs in the School System precisely because she had been principal at Palmyra Elementary School for the previous eighteen years. Test. of M. Manning.

24. When he assumed the position of superintendent in 1995, Culbreath understood that the Board had mandated change. Culbreath appreciated that the Board lacked confidence in the people who held the top positions in the central office; the Board was not satisfied with the curriculum and sought higher promotion requirements, more discipline, more involvement with parents, and better relations with business and industry in Dougherty County. Test. of J. Culbreath; Test. of O. Kelley, Sr.; Test. of C. Blaylock; Test. of C. Clark; Test. of J. Plowden.

25. From his perspective, Culbreath sought the candidate who best suited the position with respect to the Board's mandate for change. Test. of J. Culbreath.

26. Culbreath valued the collective wisdom of the interview committee and perceived that the whole committee decided that Faison was the most qualified applicant for the position. Test. of J. Culbreath.

27. In addition to her teaching experience and Level Seven certification, Culbreath perceived Faison to be particularly well qualified for the Assistant Superintendent position because she had performed well in a variety of positions and had shown that she could be promoted. Test. of J. Culbreath.

28. Culbreath perceived Faison to be articulate and thoughtful in her responses to the questions presented to her during the committee's interview. Test. of J. Culbreath.

29. Culbreath was particularly impressed that Faison shared his belief that all children can learn and not make excuses because of an urban setting, poverty, or any other circumstance. More importantly, Culbreath valued Faison's experience of serving as an administrator at the school level. Test. of J. Culbreath.

30. One of the Board members, Mrs. Jerry Plowden, believed that the new person hired for the Assistant Superintendent position should be one who could bring major changes to the School System, which she described in terms of vision and new, innovative ideas. Plowden knew that Walton was an elementary school principal and did not perceive Walton as a person who could make major

changes in the School System. Test. of J. Plowden.

31. The Board did not discuss the racial makeup of the pool of applicants and did not inquire about the race of the candidate that Culbreath recommended to the Board. Test. of L. Reese.

32. Mr. Lamar Reese, who had served as a member of the Board for fifteen years by that time, supported Culbreath's decision to hire Faison for the Assistant Superintendent position as one that was well within his authority over personnel matters. Reese was not aware of any pressure by other Board members on Culbreath to hire any particular candidate. *Id.*

33. Throughout his tenure on the Board, Reese maintained a practice of supporting the superintendent's recommendations in matters relating to personnel, with few exceptions. *Id.*

34. Mr. Robert Cross ("Cross") was the only member of the Board who recalled reviewing Faison's resume prior to voting on Culbreath's recommendation. Test. of R. Cross.

35. Except for Cross, none of the other six members of the Board knew the institution Faison had attended to earn her undergraduate degree. Test. of L. Reese; Test. of O. Kelly, Sr.; Test. of C. Blaylock; Test. of J. Plowden; Test. of M. Windom; Test. of C. Clark (who testified only that he knew that Faison had earned a doctorate degree in education).

36. None of the members of the Board knew or could recall if he or she knew the race of the candidate that Culbreath had recommended for the Assistant Superintendent position. Test. of L. Reese; Test. of O. Kelly, Sr.; Test. of C. Blaylock; Test. of R. Cross; Test. of J. Plowden; Test. of M. Windom; Test. of C. Clark.

37. The Board unanimously approved Culbreath's recommendation to hire Faison for the Assistant Superintendent position. *Id.;* Def.'s Ex. No. 15.

## DISCUSSION

■ To prevail on her claims of unlawful discrimination under § 1981 and Title VII, Walton must show, by a preponderance of the evidence, that the School System intentionally discriminated against her because of her race in declining to hire her for the Assistant Superintendent position.[4] The legal standard which applies to her intentional race discrimination claim under § 1981 is the same as that which applies to her disparate treatment case under Title VII. *Brown v. American Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir.1991); *Douglas v. Evans,* 916 F.Supp. 1539, 1555 (M.D.Ala.1996), *aff'd,* 116 F.3d 492 (11th Cir.1997). To analyze Walton's claims under both statutory provisions and determine the School System's motivation in arriving at its decision to hire Faison instead of Walton, the Court evaluates the evidence through the three-part framework established by the Supreme Court. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs*

4. Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C.A. § 1981 (West 1994). Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C.A. § 2000e–2(a)(1) (West 1994). Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race ... was a motivating factor for any employment practice, even when other factors also motivated the practice." § 2000e–2(m).

*v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). First, the Court determines whether the plaintiff has satisfied her initial burden of proving a prima facie case of race discrimination. If she does, then the burden of production shifts to the defendant to " 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " If the defendant meets its burden, then the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendants were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093, *citing and quoting McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824; *Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 524–25 and n. 2 (11th Cir.1994).

■ The Court finds, and the defendant concedes, that Walton has satisfied her burden of showing a prima facie case of discrimination: Walton belongs to an identifiable class (of white persons); she applied for and was qualified for the Assistant Superintendent position; her application for the position was rejected; and the Board hired an applicant from a minority group. *See Shealy v. City of Albany,* 89 F.3d 804, 805 (11th Cir.1996); Def.'s Revised Proposed Findings Fact and Conclusions of Law at 13.

The Court finds that the School System has articulated a legitimate, nondiscriminatory reason for hiring Faison, and thereby declining to hire Walton for the Assistant Superintendent position. The Court finds that Faison satisfied all of the posted requirements for the position: She held a Ph.D. degree from Emory University, which Culbreath considered to be exceptional training; she held a valid Level Seven administrator's certificate; she had demonstrated knowledge of programs and problems in elementary education through her experience in the Atlanta school system and curriculum specialist; and she had shown her skills in public relations through her work as a consultant and her work developing school programs in conjunction with community organizations through her work with the Next Generation Schools Project for the Atlanta school system; and she had experience in elementary schools through both teaching and supervising curriculum programs in elementary grade levels.

The Court further finds that Culbreath, and ultimately the Board, declined to hire Walton for the Assistant Superintendent position because together they found her to be less qualified than Faison. Specifically, the Court finds that although Walton arguably satisfied each of the required qualifications listed in the School System's vacancy announcement, her experience in elementary schools consisted entirely of teaching first grade and serving as the principal at Palmyra Elementary School; Walton did not have any experience working at as an administrator at the system level. To be sure, Walton did hold a Level Seven Georgia Educator Certificate, thereby qualifying her for the position under the applicable provisions set by the Georgia Professional Standards Commission. Nevertheless, Walton did not show the breadth of experience in training and supervising principals and teachers that Faison had demonstrated in her application. Finally, the Court finds that Walton did not impress Culbreath or Manning during her interview that she could be the kind of visionary leader that they had hoped to hire for the position. In particular, the Court finds that Manning had discounted Walton's ability to lead the School System toward the innovative elementary programs that the Board desired precisely because she had been principal at Palmyra Elementary School for the previous eighteen years.

Walton contends that the reasons articulated by Culbreath and the members of the Board for hiring Faison instead of her have been offered to mask their real motive(s) to hire a black person for the position. Walton has argued, for instance, that the political "dynamics on the Board" were such that those individuals in the selection process deferred to "the agenda"

designed by Culbreath and Mr. Robert Cross (who is black). Pl.'s Post–Trial Br. at 2–3.[5] The Court finds no evidence which may suggest such a set of "dynamics" at work in this process; rather, the overwhelming evidence presented at trial is that the Board had hired Culbreath to implement its mandate for major changes to the programs and curriculum in the School System, and then generally deferred to him in matters relating to personnel. In this way, the Board entrusted Culbreath to select the persons who were best suited to work at initiating such changes to the policies and promote better performance in the School System, irrespective of their race. Moreover, the Court finds some evidence which suggests that members of the Board had developed a practice of deferring to the superintendent in matters relating to personnel long before Culbreath assumed the responsibilities of that position.

Walton further contends that "the Board's denials as to the knowledge of Dr. Faison's race are simply not credible. Board members indicated familiarity with her qualifications and her resume (prior to her selection), which appropriately indicates that her undergraduate degree was from Spelman." Pl.'s Post–Trial Br. at 3. Setting aside the issues of what the plaintiff may mean or imply by her assertion that Faison's resume "appropriately indicates that her undergraduate degree was from Spelman," the Court finds no credible evidence which may suggest that any member of the Board became aware of Faison's resume at any stage during the selection process. Only one member of the Board, namely Cross, recalled reviewing Faison's resume prior to acting on Culbreath's recommendation. Perhaps

more significantly, the Court finds no evidence that may suggest that members of the Board had contemplated or otherwise indicated that their preferred candidate for the position should be of any particular race. The upshot is that there is no evidence which may lead the Court to find that the members of the Board could vote to approve Faison for the Assistant Superintendent position because she is black, yet remain knowingly ignorant of her race—with full confidence that Culbreath would recommend the candidate who conformed to this kind of racial preference. This sort of " 'environment' " or series of decisions may present an attractive theory for an account of the School System's alleged liability under Title VII and § 1981. Pl.'s Post–Trial Br. at 3. Upon careful review of the evidence presented at trial, the Court concludes that the plaintiff has fallen far short of satisfying her burden of actually proving that several individuals engaged in such a series of decisions which, taken together, constituted intentional discrimination against her because of her race.

Finally, the Court notes that the plaintiff has challenged the validity the School System's proffered explanation of desiring to hire the candidate who could help bring major change to the programs and practices in elementary education. Pl.'s Post–Trial Br. at 3. The Court is mindful that subjective criteria, such as this kind of statement of an institution's aims, purposes, or mission, must be closely scrutinized in order to determine whether they mask unlawfully discriminatory decisions. Nevertheless, Title VII and § 1981 imposes liability upon a covered employer for deciding to hire an applicant based upon select criteria—race, color, religion, sex, or

---

5. The plaintiff further argues: "Even in the process we have the fact that Dr. Culbreath, by his own admission, only called two candidates (both black) asking for their applications, those being Dr. Faison, who ultimately received the position, and another candidate from Columbus. These calls apparently took place mid-stream to [sic] late in the process, the inference being that someone, somewhere wanted more black candidates." Pl.'s Post–

Trial Br. at 2. The Court notes, however, that the plaintiff has not directed the Court to any evidence presented at trial which may support such assertions of fact or give rise to such inferences. After reviewing the testimony and documents presented at trial, the Court cannot discern any fact(s) which may support the plaintiff's argument concerning this aspect of the School System's selection process.

national origin—and does not otherwise require the employer to restructure its employment practices. *Burdine, supra,* 450 U.S. at 259, 101 S.Ct. at 1096–97. Walton is required to show evidence that the School System intentionally discriminated against her on the basis of her race through the use or application of such subjective factors in order to prevail under these provisions. *See Howard, supra,* 32 F.3d at 526 ("[The plaintiff] must introduce evidence of discrimination. A contract may be granted for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as it is not for a discriminatory reason.") (quotation and citation omitted); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir. 1997) ("Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.") Contrary to her counsel's suggestion (albeit tongue-in-cheek) that she appeared to be " 'less flashy,' boringly local," the Court does not doubt the veracity of Culbreath's stated views that Walton had good experience and was sufficiently qualified for the position. Pl.'s Post–Trial Br. at 4. Indeed, the Court found Walton herself to be forthright and earnest in her commitment to serve as an educator and willingness to serve in a leadership position in the School System. The Court is not persuaded, however, by the plaintiff's argument that the School System's expressed desire to hire a person who would bring major changes, that is, new and innovative ideas to its elementary education programs, amounts to an ad hoc account to mask its racially discriminatory motives. After close review of the evidence presented at trial, the Court concludes that the School System—namely, Culbreath and the members of the Board—engaged in a series of decisions aimed at hiring the candidate whom it believed to be best suited for the Assistant Superintendent position and without any regard for that person's race, as alleged in the complaint.

## CONCLUSION

Upon careful review of the admissible evidence presented at trial and for the reasons discussed herein, the Court **FINDS in favor of Defendant Dougherty County School System** and against Plaintiff Dr. Leanna Walton with respect to both Count I and Count II, as alleged in her complaint.

Accordingly, the Court **ORDERS AND ADJUDGES** that the Clerk shall enter judgment in favor of Defendant Dougherty County School System.